## WHITMIRE et al. v. KROELINGER et al.
### No. 216.

District Court, W. D. South Carolina.

Feb. 1, 1930.

W. G. Sirrine, of Greenville, S. C., for plaintiffs.

Haynsworth & Haynsworth, of Greenville, S. C., and Guss Wilder, of Clearwater, Fla., for defendant Kroelinger and Trustees of Clearwater Baptist Church.

Blythe & Bonham, W. H. Earle, and B. F. Martin, all of Greenville, S. C., for executor.

GLENN, District Judge.

This is a most extraordinary case. It involves a picturesque character, Miss Elizabeth Whitmire, who died in May, 1928. As is suggested by one of the attorneys for the complainants, a résumé of her life is necessary to understand the case and to a proper decision thereof. Miss Elizabeth Whitmire was born in 1854 when the present city of Greenville was little more than a country village. She was six years of age when the Civil War broke out. She had a brother, Thomas Whitmire, to whom she was devoted. Mr. Thomas Whitmire had been in business in and around Greenville and acquired some real estate. This real estate was of little value when acquired, but since his death, in 1903, has grown to be very valuable. All of the property, which Thomas Whitmire owned, passed, after his death, to Miss Whitmire as she was his sole heir at law. Mr. L. O. Patterson, an attorney of the very highest standing and a member of the Greenville bar, tells us of the way in which Miss Whitmire came into possession of this property and man-

aged to save it. His testimony in this regard is as follows:

"Q. You are the executor of the estate of Miss Betty Whitmire? A. Yes, sir.

"Q. How long had you known Miss Betty, Mr. Patterson? A. I can't remember. I knew her brother, Thomas Whitmire, very well and was very much attached to him. He was one of the most lovable characters that I have ever known. During his lifetime, I would see his sister occasionally and casually, but I saw very little of her until after his death which, I think, occurred in May, 1903. After that she came to me and asked whether I could help her to straighten up her brother's affairs.

"The Court: He left no will? A. He left no will.

"Q. Was she his only heir at law? A. She was his only sister and only heir. He had purchased a number of lots, chiefly just outside of the business district of the city and had given mortgages on them. He had found it very difficult to meet the interest on those mortgages. Some of that property had two mortgages on it; I think some mortgages covered two or more lots; I think perhaps some lots had three mortgages on it. She was at her wit's end to know what to do. I got long time loans from some of my clients and paid off the mortgages so as to straighten up the tangles. It is possible that the court has gotten an erroneous impression from the testimony that has been adduced here as to Miss Whitmire's frugality. For a number of years after her brother's death, that was absolutely necessary if she intended to keep the property. It was only by the most pinching economy that she could pay the interest and pay the debts, and she could not have done that except for the appreciation in value of the property. Afterward, it was not so necessary for her to be so economical but by that time she had formed the habit and she probably found that she got more pleasure out of helping others than out of buying luxuries for herself. I have heard incidentally of a great many people that she helped in a number of ways that I had never heard of from her. She was intensely religious and very sentimental.

"The Court: What education had she had —do you know? A: She had not had a college education. She was very emotional but she concealed those facts. She had substantial basis of good common sense and a strong streak of firmness or obstinacy, whichever you might choose to call it. She would ask me the value of certain property frequently; she would ask other people the values; she would compare them all; then she would make up her mind that by holding on she could get a little bit more, and she did because values were going up; then she would think that she could get still a little bit more. She was always reluctant to sell. One of the reasons, which she assigned for holding on to her property, all of which came from her brother, as I understand it, was that he had worked for it and she didn't intend to let a single piece of it get away from her, that is, be sold at forced sale. She intended to save every piece of it. When she had once made up her mind to do anything, it was next to impossible for anybody to change her mind. She had a very strong will and in most things she was sane and well-balanced. I drew several wills for her. I suppose it was not more than a couple of years after her brother died when she asked me to draw the first will, and I drew perhaps one or two after that.

"Q. Do you remember generally the contents of those wills? A. I have them here in my pocket."

Since the decision of this case involves that difficult problem of deciding upon the state of mind of Miss Whitmire it is well to point out in the very beginning that Miss Whitmire was of another generation. We are called upon to determine whether or not certain of her actions were the free and voluntary results of her own will, or whether these actions were the desired objects of other parties who by undue influence have imposed their will upon her. To do this, we must transplant ourselves as best we can to her situation. In many communities, there have been, during the last thirty years, characters more or less similar to Miss Whitmire. The situation of a maiden lady sheltered under the old régime of the South, living on for years after the "old order" had passed away, and with her attitude towards life remaining constantly the same in spite of all changes around her is not uncommon.

Miss Whitmire executed her last will and testament in 1923. This will was somewhat similar to the previous wills which she had made. Miss Whitmire's heirs at law originally brought a suit to set aside the will for a lack of capacity and for undue influence. They also ask that certain transactions whereof the defendant Kroelinger and trustees of the Clearwater Baptist Church were beneficiaries be set aside on the grounds of undue influence. These relatives have abandoned that phase of the case wherein they sought to set aside the will. They have joined with the

cross-complainants, however, in asking that the transactions inuring to the benefit of Kroelinger and the Clearwater Baptist Church be set aside as being the results of undue influence exercised over Miss Whitmire. This, therefore, is not, in its present status, a suit to set aside the will for lack of testamentary capacity or undue influence. So far as setting aside the will is concerned, the heirs at law of Miss Whitmire have abandoned that phase of the case, and well they might have. The only reasonable inference from the testimony establishes very clearly that the will must stand. In 1923, when the will was executed, Miss Whitmire was clearly possessed of testamentary capacity, and the beneficiaries of the will never sought to exert any influence over Miss Whitmire. Indeed, the specific legatees were so far from exerting any undue influence over Miss Whitmire that they evidenced a reluctance of inquiring into Miss Whitmire's affairs. These specific legatees were kind neighbors and friends in and around Greenville who helped her as best they could and who rendered her many ·services, but never sought to impose their will upon her. The last will as made was very similar to two wills which she had made previously and was a very logical and natural will for her to have made. The beneficiaries in all the wills were of two classes: First, individuals who were closely identified with her family and who had been very good to her in one way or another in her lonely life. The other class consists of public charitable institutions in and around the city of Greenville.

Miss Whitmire spent about two-thirds of the year in Greenville and about one-third, the winter months, in Clearwater, Fla. Her whole mind seemed to have had two phases: One devoted to Florida, and the other to her friends in and around Greenville, S. C. This suit in its last analysis depends upon the decision of the question as to whether large gifts made to a church in Florida were or were not the result of undue influence exercised upon Miss Whitmire by one A. J. Kroelinger, pastor of this church. When in Greenville, Miss Whitmire talked very little of Florida, and, when in Florida, she told no one of her affairs in Greenville.

We call attention at the outset to general propositions which we must keep in mind in considering this case. One, and here the layman is so apt to go astray, is this, that undue influence is not always exercised over a person of weak mentality. That undue influence, in some cases, may be exercised over a person of decided ability and even of strong will power. And, in thinking of this, we must not be misled by proof of eccentricity. To put it succinctly, a person has a legal right to be eccentric. Human actions, whether by manner of life or by deeds of legal import, may be eccentric and unusual, but that fact does not mean that they, as a matter of law, are the results of undue influence. Consideration of this proposition was dealt with by the South Carolina Supreme Court in a classic law case. Lee's Heirs v. Lee's Ex'rs, 4 McCord (15 S. C. L.) 183, 17 Am. Dec. 722. The following is quoted from the opinion of the court (page 196 of 4 McCord [15 S.·C. L.]): "The law puts no restriction on a man's right to dispose of his property in any way in which his partialities, or pride, or even caprice may prompt him, if he does not infringe any rule of policy. In the present case, the testator appeared to have the double design of showing his resentment to his relations, and of indulging in the ambitious vanity of having himself recognized by the states of South Carolina and Tennessee as their benefactor."

The language of the court in Means v. Means, 5 Strob. (S. C.) 167, 192, is as follows: "It is not influence merely, but undue influence, that is always alleged—something excessive and unlawful. It is not the influence of friendship or affection that can be complained of; nor 'the influence of argument or entreaty, nor the impression made by kindness or prudence, nor even the effect wrought by servile compliance or mean endurance of wrong. It must be something which destroys free agency. Motives of almost every, conceivable kind may be offered, and if the mind of the agent, free to reject or adopt the motives, yields its assent, the act is the act of the agent."

A more eccentric person than Mason Lee, so far as his habits are concerned, could hardly be chosen from life or from pages of fiction. Nor could a more eccentric will be found anywhere. Yet, by reason of his strong will power and clear understanding of business transactions, the court held that his will, though eccentric, did not reflect a lack of testamentary capacity or the result of undue influence.

Undue influence generally has its origin in certain well-recognized classes of human relations out of which influence grows by reason of the relation itself. These relations are of many types. The better recognized and more frequently occurring classes are father and child, mother and child, attorney and cli-

ent, trustee and cestui que trustent, doctor and patient, religious adviser and persons subject to religious appeals.

Before this case came on for trial the complainants served notice of a motion to submit certain issues to a jury in aid of and for the guidance of the conscience of the court. The court came to the conclusion that the request for submission of issues to a jury, being a question entirely of discretion in an equity case, should be refused. This particular court yields to no court in its high regard for the verdict of a jury. But it readily is seen that the contest here, so far as the substance is concerned, is a contest between a Florida church and a number of charities in and around the city of Greenville. Taking all the setting of the case into consideration, it is clearly one where the court must itself shoulder the burden of the difficult task. The issues which were proposed for submission to the jury have, however, furnished this court with a splendid analysis of the questions to be decided, and the court is indebted to the attorneys for this splendid work. These questions are as follows:

1. Should the $65,000 note referred to in paragraph 4 of the cross-complaint be declared void for abuse of trust and undue influence, as alleged in said paragraph?

2. Should the $65,000 note referred to in paragraph 4 of the cross-complaint be set aside upon any other ground therein set forth?

3. Should the $35,000 note referred to in paragraph 4 of the cross-complaint be declared void for abuse of trust and undue influence, as alleged in the said paragraph?

4. Should the said $35,000 note referred to in paragraph 4 of the cross-complaint be set aside upon any other ground therein set forth?

5. Should the deed to the Augusta street lot, on or about March 1, 1922, be declared invalid and set aside by reason of improper persuasion, abuse of confidence, and undue influence, as alleged in paragraph 3 of the cross-complaint?

6. Should the deed to the Fall street lot, on or about January 8, 1925, be declared invalid and set aside by reason of improper persuasion, abuse of confidence, and undue influence, as alleged in paragraph three of the cross-complaint?

7. Should the cross-complainants, or any of them, have judgment against A. J. Kroelinger, as pastor, and James McGill, J. L. Pemberton, Delisle Hagerdorn, and C. N. Alexander, as trustees of Clearwater Baptist Church, otherwise known as Calvary Baptist Church, Clearwater, Fla., for any other of the amounts claimed in said cross-complaint?

8. If cross-complainants should recover anything under the seventh issue above, how much should they recover against the defendants named?

These issues will be discussed as far as possible in the chronological order in which the various gifts and transfers occur.

This court is clearly of the opinion that the original gift of $15,000 to buy the lot on which the church in Clearwater is now built should be sustained. This gift came about in the following way. Miss Whitmire, along with her friend, Miss Asbury, was spending the winter of 1919–20 in Florida. Just before she went to leave for Greenville, Kroelinger was proposing to his congregation that they begin making plans for the erection of a new church. He had been looking around Clearwater for a suitable lot and had several in mind. It seems that Miss Whitmire had been impressed by some of the sermons which Mr. Kroelinger had preached, and that she felt kindly towards him and his congregation. One afternoon, a day or two before she left to return to Greenville, he went around to her modest home, and, according to the testimony of Miss Asbury, a witness above reproach or suspicion, Miss Whitmire of her own accord told him that she had planned to give the lot on which the church was to be built. This court is firmly convinced that at this time Kroelinger did not know that Miss Whitmire had any considerable property. He evidenced surprise at her suggestion, and, according to Miss Asbury, was a little reluctant in accepting such a proposition. Miss Asbury, in an innocent manner and unmindful of what might follow, relieved the situation by simply whispering to Kroelinger words about as follows: "Let her do it, she has plenty and it will not hurt her." Of course what Miss Asbury evidently meant was that the gift of five or eight or ten thousand dollars (the prices of proposed lots) would be a contribution which would not seriously diminish Miss Whitmire's possessions.

Miss Whitmire left Clearwater a day or two after this, but, before she left and before she had any long conferences with Kroelinger, she gave him a note for $10,000, which note was witnessed by Miss Asbury. The evidence further shows, and this is very reasonable, that Miss Whitmire, who had a remarkable knowledge of real estate values,

had been looking around Clearwater herself for a suitable lot on which the church might be built. Miss Whitmire then left for Greenville, and, while waiting in the Terminal Station at Atlanta between trains, wrote to Mr. Kroelinger the first letter of a most remark-able correspondence which continued for seven years. In this letter, she reaffirmed her desire to purchase a suitable lot on which to build the church and to aid further in the building program. It is impossible to have all of the four hundred and more letters printed in this opinion, but, in order for readers to understand the nature of the correspondence, it is well to set out a few. This letter was as follows:

"My dear Mr. Kroelinger: I am not waiting until I reach my home before sending you some message. As the return trip was made through the flat woods of Florida, and especially at the sunset hour, my thoughts were with you and your work. Yes and they led me far into the future when this big new work that you are planning shall be completed, and that when at some sunset hour you may be holding some Vesper service, or I should put it some Thanksgiving service for some purpose, with the brilliant glow from the Bay pouring in upon you and your people as if to bless your work. You see I am fixed in my mind on some lot that will give you both breezes and glow. I realize that to cross Cleveland St. might not meet the sanction of your Committee, but should you fail in securing the Kyle or the Library lot, try for the lot across from the 'Sun' office. This winter I noticed that this property had gone down, in other terms had a neglected look and the present owner might be induced to dispose of as much as you want. Through the journey yesterday I had much time for thinking, and I firmly believe that you have been led into this field and this work, for lasting good, the signing of my name to that paper has been a solace to me, but it is a very small matter compared to the good you can do for the Cause. You are the Daniel for this work. And to reassure you of my firm purpose as well as enthusiasms—just as soon as I possibly can I will see my attorney and tell him what I have done and request him to meet this obligation promptly. Should I pass away before, you are secured. You know how it is with lawyers and estates; in S. C. an executor has another 12 months in which to either pay or collect debts. And I would not have you hampered or delayed by some neglect of mine.

"This writing may not be very legible, but I feel some what fatigued, then too I am surrounded by the noise and hurry that we always find in a terminal Station. But when my mind becomes so involved in a cause, I am always eager to have those interested to share with me my interest the reason I write at length and under such conditions—then too, I am alone, as Miss Asbury has gone with some friends up into the shopping district while I write this to you, and smile, because less than a week ago, I had planned to spend when I reached Atlanta; I expected to purchase some rugs and draperies and the things that we women folks like to indulge in, but I am quite willing to go home and make what I have serve me. The Master's work must come first. But I must bring this pleasure of writing my thoughts to you to an end, but must add my thanks for your kindness and thoughtfulness in having Mr. T. bring our luggage down and it was pleasant too to have someone to say goodbye as the train pulled out.

"Tonight at prayer meeting hour we'll be thinking of you and your instructive lecture.

"With best wishes,
"Your friend, Elizabeth Whitmire."

The receipt of this letter, plus Miss Asbury's statement, "Let her do it, she is amply able to do it," caused Kroelinger's ambition for a big church on a beautiful lot to have some hopes for realization. He immediately sought out then the very best lot in Clearwater. Nor does the court feel that he should be censured for this. It happened that this lot cost not the original eight thousand nor the ten thousand, for which amount he had Miss Whitmire's note in his pocket, but $15,-000. He accordingly wrote her fully of the developments. His letter, the first one that he ever wrote to her is as follows:

"Clearwater, Fla. 3/12/20
"Miss Elizabeth Whitmire Mc.Bee Ave., Greenville, S. C.

"My Dear Friend: Your kind and interesting letter was received last night and I am hastening to answer it. It was kind of you to take the time and energy to drop me a few lines though you were so tired from your trip. I have remembered you in my prayers—Oh, you can never know what rejoicing your Christian part in my life has meant to me—I seem more in dream than anything else somehow it seems too good to be true. One may be able to take in some things but this is such a turn in the tide here that more and more I rejoice and thank Him for his goodness to me. One of my deacons

said today 'It seems to me that I am in a dream, I can hardly believe it.' I have come to realize more and more that if the Baptists would come to the front in this town they must do something out of the ordinary. And since you have left I have been able to sleep but very little as this thing has grown upon me. I am already planning to arrange this church to be different from anything else in the U. S., and that is for an arrangement that will allow us to hold out-door services right in sight of the Bay that you love so well—think what it will mean for us to be able to hold services out in the open just as the sun is setting in the golden West. I could get absolutely nothing satisfactory on the Front anywhere, so I went to work at once to see what I could do about the property opposite the Sun office—he wanted to sell the whole thing, but finally I pursuaded him to let me have the corner lot 175 feet deep on Cleveland St., and 165 feet wide on Osceola St., just think of a thing like that? Of course it is a big price to pay, but in the years to come it will be the greatest thing in the entire U. S., and to you will be the glory of making it possible to have the Baptist Message proclaimed on this great corner and that within sound of the waves of the Gulf and within sight of such sunsets as are seen nowhere else.

"I have sent you a telegram asking if you will give the $15,000, I want you to have the honor of giving the entire lot, and the meaning of this to you in the days when you will be in the twilight hours of life will bring you the sweetest peace that ever flooded a human soul. You can in the days to come pass that corner and know without the shadow of a doubt that without you such a great, great blessing never would have come to the Baptists in Clearwater, and your name will be an honorable one with our people for all time to come.

"I have been completely exhausted since you left—I have tramped and tramped looking for a lot now it is this one or simply a plain lot on noisy Ft. Harrison. I trust you will not think that I am wanting to burden you too heavily, I am simply anxious that the honor for the whole lot be yours, and because I know the peace that will be yours when you come back and see that wonderful lot on the corner. I feel like getting down to work and doing a man's work with such prospects before us. May the God whom we love and serve bring you the rich blessings that you deserve.

"I am very much grieved over my dear Mother's condition, she is very poorly, and I plan to go up to see her just as soon as I can get this lot proposition settled beyond any possibility of a loss of it to the work.

"Am enclosing a clipping or two from the Sun—I will always send you the Monday edition that you may know about your work.

"With all good wishes, prayers and hearty greetings from one who understands and appreciates you.

"(P. S. Keep on with your good jokes, smiles, etc., that is why we all like you down here) Regards to Miss Asbury.

"Yours in His Service,

"A. J. Kroelinger."

She received this letter after arriving home and immediately wired him as follows: "Yes, buy lot at once." She then went to her attorney in Greenville, and told him what she wished to do and made arrangements to raise the fifteen thousand. She very shortly sent the money to Mr. Kroelinger and the lot was purchased. This was in March of 1920. While many of us may feel that we would never have presumed on her to raise the suggested amount of the donation, from ten to fifteen thousand, yet this court is clearly of the opinion that the antecedent confidential relation which gives rise to undue influence did not at this time exist, and that there is nothing which would cause this gift to be viewed by a court as anything other than a voluntary gift to a religious cause. Up to this point, Kroelinger had done nothing more than any of our churches have been doing all over the country for the last ten or twelve years. To some of us the rules of propriety have been violated by all of the organizations having ambitious goals to attain, but the courts generally have sustained these gifts obtained by high pressure methods. Furman University v. Waller, 124 S. C. 68, 117 S. E. 356, 33 A. L. R. 615.

The duty of determining freedom of will on the one hand and "undue influence" on the other is extremely difficult. It is very easy to take a cynical view that every selfish benefit received from another is a result of undue influence; on the other hand, it is easy to go too far and take the view that every gift to a church is sacred, prompted by the religious instincts of a person naturally religious, and to feel that every dollar given is impressed with a sacred trust, and that a court, when called by duty to investigate such gifts is treading upon holy ground. But in this case, where the evidence furnishes such a complete story of the relations between Kroelinger and Miss Whitmire, this court feels that it has arrived at a correct deter-

mination of the gifts which were the result of Miss Whitmire's own desires and those which resulted from undue influence exercised over her by Kroelinger.

Between March and July, the date of the large note for $65,000, Kroelinger only saw Miss Whitmire twice. He only wrote her a few letters in which letters indeed he expressed ambitious ideas and which letters exceed the bounds of propriety perhaps, but none of which amounted to the exertion of undue influence. Indeed, there seems to have been no knowledge on the part of Kroelinger that he had any great influence with Miss Whitmire. On the occasion of his first visit to Greenville in April or May, 1920, he received from her a gift of $2,500 which centered around the idea of memorial windows on which his name was to be written. She gave the $2,500 and he accepted it with the proviso that he would state to his congregation the circumstances of the gift. However, in doing so, he was to keep her name secret. The significant fact, however, about the May trip is that on this occasion Mr. Ligon, a friend of Miss Whitmire's, who handled her business to a large extent, took Kroelinger around Greenville and showed him what property Miss Whitmire had. This gave him a yard stick by which he was to measure his subsequent requests from her. He returned to Florida and got his building committee active at once. They made plans for a church to cost $100,000, in addition to the lot which they had already purchased. Very full evidence was introduced about the wealth of this congregation, its size, and the nature of its personnel. It appears that the plans for a $100,000 church were very ambitious and exceeded the ideas which the conservative Scotch-Irish in Piedmont, S. C., have generally adopted for church buildings. Yet, when we consider that the general financial depression did not start until midsummer 1920, and that real estate and everything else in Florida was on the rise at this time, we cannot say that the plans were altogether inspired by Kroelinger's vanity and confidence that the main contributions must come from the "little lady" in Greenville.

Miss Whitmire, herself, in the meantime had been urging Kroelinger to come back to Greenville. Undoubtedly the man had made a great impression on her. A Baptist Institute to be held in Greenville in late June and early July, 1920, furnished a convenient pretext for both of them. She used it as an argument to get him to come. He used it as an excuse for coming. At any rate, he came and stayed with her for ten days or two weeks. As to what happened during this time, we have practically no extrinsic evidence. We must rely upon Kroelinger and have only his testimony for determination of what did take place. When he left there, he left with a note payable to his church for $65,000. The note was written in Miss Whitmire's own handwriting, signed by her and is as follows:

"$65,000.                    July 3rd, 1920

"Two years after date I promise to pay to the order of Clearwater Baptist Church Sixty-Five Thousand Dollars, at Clearwater, Florida for value received, with interest from ——— at the rate of — per cent. per annum; said interest to be paid annually, and, if not so paid, to become principal and draw interest at same rate. In case of Suit, ——— also agree to pay all costs and expenses, including ten per cent attorney's commissions.

"Elizabeth Whitmire, Greenville, S. C.
"Due July 3, 1922
"P. O. Clearwater, Florida."

Of course, this was a most unusual transaction. If the transaction stood alone, the court would feel disposed to set it aside, but, as is pointed out later, the transaction was ratified by numerous acts and deeds most of which were performed when Kroelinger was in Florida and Miss Whitmire in Greenville. She ratified it in practically every letter that she wrote to Kroelinger. She ratified it by applying thereon proceeds of property sold and the proceeds of loans obtained on her property.

Miss Whitmire kept no books, but she had her separate pieces of property constantly in mind. She had intended to make large gifts to religious and charitable causes before she ever met Mr. Kroelinger. In 1918, before Kroelinger had ever appeared on the scene, she had left the South Main street property to Furman University. It cannot be said therefore that her idea of giving to the Baptist cause in some way was one which was prompted entirely by Kroelinger's solicitation.

There is in evidence this will executed on the 5th day of February, 1918. In this will, she makes a bequest to the Greenville charities which she also remembers in her final will. She deals with the South Main street property separately, and as follows:

"I give and devise to Furman University my lot of land in the Sixth Ward of the City of Greenville, South Carolina, fronting on Pendleton or South Main Street and now

rented to Chas. Ellis or Coca-Cola Bottling Co., running back beyond the branch is lands of Furman University, and adjoining lands formerly belonging to the late O. P. Mills, in trust, however, to maintain the same as a free public park, to be open to the public under such reasonable regulations as may be prescribed by said Furman University in perpetuity. A public rest room, reading room or similar building may be erected upon said land; but no automobile or other motor vehicles or horses, wagons, carriages or similar vehicles shall be permitted upon the said land. In the event that said Furman University shall decline, fail or neglect to maintain said land in the manner above stipulated, then the title to said land shall be vested in the City of Greenville, in trust to maintain the same as a park in the manner above prescribed, in perpetuity."

The Furman University people had doubtless learned of her intended generosity, and they, in an entirely proper way, suggested to her that she remove the restrictions placed around the use of the property. Mr. Patterson tells of all this and the records corroborate his testimony. He testifies as follows:

"In one of the wills she had left this property to Furman University on a certain condition, the property on South Main Street, a portion of which was afterward sold to the Standard Oil Company. Those conditions apparently were not satisfactory to Furman University. Dr. McGlothlin and Mr. Geer came to my office and had an interview with Miss Whitmire in my presence to try to induce her to leave them the property free on conditions, so that they could sell it and use the money for the University. At one time, I don't remember the date, she told me that there was a Baptist Church in Clearwater; that the congregation was very small and very poor; that their building was small; that there was a lot between that church and Bay which was very important for them to own; that some day it would be worth a great deal of money and that it was very desirable to have that view from the church over the Bay, and she asked me whether I thought it would be all right for her to buy the lot for them; $15,000.00, I think, is the price she mentioned to me though it may have been later. I told her that there was no reason in the world why she could not do it; that the property was hers absolutely and if she chose to give it away to anybody or to destroy it, there wasn't any one who could legitimately raise an objection. I knew that her relations, her close relatives did not get along well with her and I knew that she had a strong feeling against one of them. Later, she told me that she wanted to convey the lot on South Main Street, which she had previously contemplated giving to Furman University, to that church, and she asked me to draw a trust deed, and I did so. I have here the office copy of it."

It appears further that she at one time thought of deeding this same property to Furman University. In other words, we are pointing out that, so far as the South Main street property is concerned, Miss Whitmire had never intended that it would be part of the trust property which should inure to the benefit of the Greenville charities, to wit, the hospital and library. In this original will she had provided that, should Furman fail to accept the legacy, the property should go to the city of Greenville subject to the same conditions. The provision was not that it should become part of a large trust subject to sale, with a view of providing income, but should be kept as a park. *All of this happened before Kroelinger met Miss Whitmire. In other words, if Miss Whitmire had died in 1919, this South Main street property would not have gone to the present complainants.*

To one who has studied the case from a psychological standpoint, it is clear that Miss Whitmire had the mental habit of carrying her accounts in her head and centering her thoughts around specific pieces of property. She loved to think about the fact that they belonged to her, and being a good business woman, as everyone admits, she had the "sense of possession" highly developed. In her letters she refers to these pieces of property in an affectionate way. They had come to her from her devoted brother and she felt as if they were sacred. She had the habit of constantly attaching values to these pieces of property and several of the business men who were witnesses testified that she would talk to them about what they thought the specific pieces of property were worth.

The evidence shows that she gave Mr. Patterson, her trusted attorney and advisor, some memoranda, and in these she valued this South Main street property at $68,000. Here we find a remarkable coincidence to which this court attaches great value. The large note was for $65,000, and at the time she gave this note she had previously given to the Clearwater Church $2,500. These two gifts totaled $67,500, an amount lacking by $500 only the value which she herself had put upon the South Main street property. In other words, we point out that the natural train

of thought running through Miss Whitmire's mind was this: "I will give this South Main Street property not to Furman University, the great Baptist school, nor will I deduct anything from my bequest to the hospital or the library, but I will simply divert the intended gift to Furman University to the Clearwater Baptist Church." This view is corroborated by many pieces of evidence. It was in 1918–1919 that she had the conferences with Mr. Geer and Mr. McGlothlin, leading friends of Furman. It was early in 1920 when she gave the original $15,000 to buy the lot in Florida. In July, 1920, she gave the note for $65,000, making the mental subtraction of approximately $3,000 from the $68,000 value of the South Main street property. In October, 1920, she had Mr. Patterson to prepare the codicil to her will. The wording of the codicil is very significant. In it she cancels the gift to Furman University and directs that the South Main street property specifically shall go to pay such notes or obligations as she had made or might thereafter make. In other words, Miss Whitmire then struck the balance of assets and liabilities; the value of the South Main street property on the one hand; the balance due on her pledges to the Baptist Church in Florida on the other. The habit of a lifetime, walking around the city thinking of real estate values, and of carrying arithmetic in her head, is evidenced in this transaction. In her letters to Kroelinger, between July and December 1920, she assures him that the matter had been fixed and the $65,000 gift had been safeguarded in a very definite way. To make a long story short, she had decided that her donations to the cause of the Baptist Church generally should take the form of a church building in Florida for the needs of a poor struggling congregation rather than a gift to Furman University. Especially since the Furman authorities did not wish to have the property tied up with eccentric provisions. This court cannot refrain from saying here that having been educated in a near by institution, and having "drunk the delight of battle with his peers" on the athletic fields of Furman University, has an affection for this great institution and would have been glad if this or any other good fortune had come Furman's way. But the point is, it was not the court's property, nor the property of the cross-complainants. It was Miss Whitmire's property, and the law protects her in her right to give it by deed or will to whom she pleased.

She had drawn in her mind this contrast. In Greenville all of the leading people were Baptists. There was located their historic and great school of Furman University. A campaign was being launched to raise $75,000,000, and Furman was, under the plans, to receive benefits from it. In other words, it looked so as if the Baptists and the Baptist cause in Greenville was financially prosperous in 1920. The congregations were leading people, well-dressed lawyers, professors, doctors, bankers, and business men. On the other hand, there was a small struggling congregation in Clearwater, Fla. A town where the Presbyterians and Methodists were in the lead so far as human standards govern churches. The congregation, while made up of the very best people of the world, were not the wealthy or important people. Is it strange, therefore, that Miss Whitmire decided to make the small church in Clearwater the beneficiary of her bounty?

Likewise, we point out that Miss Whitmire had already fixed in her mind a firm intention of giving the South Main street property to some Baptist cause. Therefore, the original idea of devoting this property to this purpose was her own. Of course, Furman University may have been disappointed, but Miss Whitmire was perhaps wise, since she was giving to the church to give it to a specific congregation.

Kroelinger and his trustees put every dollar that they got on this $65,000 pledge into the church itself. There is not even a suggestion that Kroelinger himself ever took any of the money for his own use.

There is another feature about this gift which must be considered and which has a legal effect. This gift of $65,000 was made upon the condition that the congregation at Clearwater would raise at least $35,000 more to put into the church. The evidence shows that they had, by the date of Miss Whitmire's death, raised and paid in not the $35,000 alone, but a total of $64,000. It is common for a person of means to say to a group of people who have less of this world's goods, "I will match dollar for dollar with you on this campaign, or I will give two dollars for one; and I will pay my pledge just as rapidly as you people pay yours." The letters show that Miss Whitmire considered her gift as being made on this condition. And she was frequently asking how much the others had given. Such gifts have been the subject of litigation when generosity has become repentant, or when expectant heirs are tripped in their eagerness to inherit by the generosity exercised by a relative towards some religious or charitable institution. In all of

these, the courts have gone very far in upholding the gifts, especially where the other parties have performed their part of the agreement. The struggling congregation in Clearwater has done more than this. While Kroelinger was the chief actor, we must remember that he was representing his humble congregation in Clearwater, and that they incurred enormous obligations and launched upon a big enterprise by reason of the gifts made by Miss Whitmire and ratified by her from time to time until the very day of her death.

The bankers and lawyers, doctors, preachers, and lady friends all testified that she was a woman of superior intelligence and great determination. That she recognized the meaning of an obligation, and that she was not a woman who could be easily influenced one way or another. But the evidence which more than anything else causes this court to decide that the note for $65,000 was a gift made of Miss Whitmire's own desires, and was not the result of undue influence, is found chiefly in written documents. It centers around her handling of the South Main street property. When this chain of events is considered altogether, the only reasonable view which this court can take is that Miss Whitmire had even, before she met Kroelinger, decided to give this South Main street property to the Baptist cause in some way. The note for $65,000, plus the codicil to the will, followed by deed to trustees, and then followed by the sale to the Standard Oil, simply amounts to a diversion of this property from Furman to the Clearwater Baptist Church.

The correspondence between Kroelinger in Florida and Miss Whitmire in Greenville continued through the late summer and autumn of 1920. In this correspondence, they were telling each other intimate details of their lives. It is well known that people can become very intimate when they keep up a continuous correspondence.

Miss Whitmire left Greenville in December, 1920, and went to spend the winter in Clearwater. There Kroelinger had an opportunity to see her every day and to talk over his plans for the new building with her. He knew that she was interested in his church, and that she had pledged $65,000 towards the erection of the building. He knew that she was intensely religious, and his acquaintance with her and his knowledge of her temperament from the letters which she had written gave him reason to believe that she might give more. We feel that, therefore,

the confidential relation of spiritual adviser to a person of spiritual temperament came into existence in December, 1920. We find, therefore, that the transactions, in the nature of original gifts which take place after that date, especially when executed in Florida, call for an explanation from Kroelinger. In other words, we feel that at this time the burden of proof shifts from the complainants to Kroelinger himself so far as the transactions executed in Florida are concerned. It appears to the court that he has not furnished this explanation. On the contrary, it seems that Kroelinger began to plan, not for the $100,000 church, but for a much larger church which was not commensurate with the needs of his congregation. While we are convinced that the idea of the gift of $65,000 (value of South Main street) was Miss Whitmire's own desire, we are equally convinced that the plans for the finest church in Florida were born in Kroelinger's own mind. He then entered into a deliberate campaign to make her generosity finance his ambitious plans.

There is practically no ratification of the $35,000 note. The only ratification at all is found in the fact that several of her letters refer to her "pledges." The use of the plural here is the only ratification of any weight at all. And while this is some evidence, we do not feel this is sufficient to ratify a gift of $35,000 obtained under the circumstances. The attempts to strain certain of her letters into a ratification of the second note cannot succeed. Nor does the theory that the Court street deed executed in Florida, where Kroelinger had Miss Whitmire in his grasp, is ratification, impress the court. There is a close identification of the South Main street property with the $65,000 gift. There is no linking up of the Court street property with the $35,000 note. Also, the $35,000 note was given about the time that the handsome pastorium in Clearwater was purchased and is clearly tied up with Kroelinger's plan for expansion beyond the original project of $100,000. Miss Whitmire gave the $65,000 freely, but the $35,000 note was signed by her after she had gotten into a position where Kroelinger could, and did, exercise undue influence over her. The letters which Kroelinger wrote Miss Whitmire during the summer and fall of 1920 are full of plans, and in them he adroitly suggests that the $100,000 is not going to be enough. He begins to mention it to the congregation in Clearwater. He began to work on her extreme loyalty to the Baptist cause and suggests to her that larger plans will be necessary in order to keep up with the Presbyterians and Methodists and

Episcopalians in Clearwater. One paragraph in practically every one of these letters deals with that feature of the case. So that this court comes to the conclusion that Kroelinger at this time allowed his ambition to spur him on to the point where his attitude was no longer that of appropriate gratitude to God and Miss Whitmire for aid in his original program which was commensurate with the needs of his congregation in their legitimate desire for expansion. So that when Miss Whitmire arrived in Florida in December, 1920, and after she had stayed there a short time, we feel that any subsequent transaction in Florida must be looked upon with grave suspicion. The note for $35,000 was given by Miss Whitmire after she had spent several months in Florida where she came in daily contact with Kroelinger and where he, realizing her natural bent, and at the same time the influence which he had over her, had opportunity to enforce his will upon her. The court decides therefore that it cannot sustain the $35,000 note, will be obliged to hold that it was the result of undue influence, and is not binding upon the executors of Miss Whitmire's will.

█ Examination of letter No. 18 shows that it contains the following well thought out suggestion that the original plans were not ambitious enough and that he (Kroelinger) felt that a larger church should be built and more property bought. The significant paragraphs are as follows:

"I cannot begin to tell you how much talk there has been in town over the good luck that has come to the Baptist Church. It is having its effect on outsiders as well for at the Ladies Aid picnic six or more women who are not members of our or any other church here were present, women of good standing in the city. The Clearwater Sun mentioned in a kind of boastful spirit that I didn't like the fact that sooner or later it would be known who had given the lot and the money. The Presbyterians can't somehow take it in—I suspect they think it an outrage that 'poor Baptists' should be so blessed.

"I have often mentioned to you one of our new deacons, Mr. Hamilton—he is a very shrewd business man and is making his own business 'go.' He has been connected with large churches. He came to me this week and after speaking words of appreciation for what you had done mentioned that he was uneasy about the control of the other part of that property being in the hands of a Presbyterian and one of the moneyed men of a certain click here, and wondered if it would not

be best for us to buy it instead of building a new pastorium. He said that a new pastorium in keeping with such a church would likely cost, furniture and all, about $20,000.00 and the Bay front property there can very likely be bought for about $25,000.00. He thinks that after the drive way avenue along the Bay is built that some filling in would give us a very valuable property, a possible two acres. He is afraid that some would do anything to spoil our open-air service feature if at all possible. What do you think of the idea? It has appealed to our deacons as they realize the position we would be in if at any time some such spite work should be carried out. They are also afraid that the Presbyterians might be vindictive enough to build their church there. I don't know I am sure, whether or not they would ever undertake any such thing. I thought I would speak about it to you and see what you think. In that case, we could place the church a little farther toward the bay and would have plenty of parking space on our own grounds. Also grounds for picnic and social gatherings that could not be beat."

This letter was written in August, 1920.

For the same reasons we hold that the deed to the Augusta street lot executed on or about March 1, 1922, shall be declared to be invalid and set aside by reason of abuse of confidence and undue influence.

Likewise, the deed to the Fall street lot, executed on or about January 8, 1925, be declared invalid and set aside by reason of abuse of confidence and undue influence.

█ We now come to the question of the gift of the little lot on Bay street in Clearwater, Fla., to Kroelinger and Mrs. Kroelinger personally. Reluctantly, we point out that the circumstances under which this gift was made, and contrast it with the early gifts of $15,-000 and $65,000. It was in the shape of a deed which Miss Whitmire executed on the ——— day of ———, 1926, while in Florida and after her personality, while she was in Florida, seems to have been completely dominated by Kroelinger. We point out in the very beginning that this gift does not possess the inherent protection which a court throws around gifts for religious or charitable purposes. It was not a gift to the church, but to Kroelinger personally. The deed was executed when Miss Whitmire was frail of body, was living in Kroelinger's home when she was driven to deal with him more intimately than ever before by reason of the fact that her associates in Greenville had become less intimate. Kroelinger testified that he paid

her for his property, but frankly his testimony on this phase of the case did not impress the court. When asked for evidence of the payment he seemed to be completely at sea and began to talk about lost checks and money received from his mother. Documentary evidence was obtainable on every other phase of the case, but none was offered on this phase. He not only did not have the checks which he had paid to Miss Whitmire, but he had no evidence of money having been paid to him from his mother's estate. If this had been obtainable, it must have been produced. She died in New Jersey, and exemplified copies of the probate record there were not offered. This transfer had been mentioned in the complaint as one being subject to suspicion, and he had all necessary notice to produce whatever evidence he could to sustain the validity of this deed. Further than that, it appears that Miss Whitmire died in his home, and before the midday hour he had rushed with this deed to the office of the register of mesne conveyance and had the deed recorded; the deed being all the time in his possession. The court feels, therefore, that it must set aside this transfer and require the defendant Kroelinger to reconvey this Bay street property to Patterson, as executor of Miss Whitmire's estate.

The practical effect of this decision will be to sustain three gifts which Miss Whitmire made to the church. The first gift of $15,000 was to buy the lot, a second of $2,500 for windows. The third gift was the pledge of $65,000 towards the building fund. Against this pledge every payment which Miss Whitmire made to the building fund, whether the payment was made directly or indirectly, must be credited. Therefore, the court now points out that there has been paid on the $65,000 pledge a total of $62,000. This is made up as follows:

Payments made from time to time
  directly on the $65,000 pledge. . $36,000.00
Cancellation of notes which the
  church owes Miss Whitmire. . . . $15,000.00
Payment of $10,000, which this
  court directs shall be credited
  against this $65,000 pledge. . . . . $10,000.00
The early pledge of. . . . . . . . . . . . $ 1,000.00
                         ——————
                     $62,000.00 [1]

In other words, the $65,000 pledge had been practically liquidated by Miss Whitmire before her death, and this court holds that

[1] Note. These figures are of course in round numbers and details and interest calculation will be covered in final decree.

upon the payment of this $3,000 the trustees or other officers of the Clearwater Baptist Church must reconvey or turn over in the most practical way all property of Miss Whitmire which they hold.

Following the suggested effect of this decision, so far as it goes, as submitted by Messrs. Blythe & Bonham in their brief, we summarize the effect as follows:

1. That the note for $35,000 executed by Miss Whitmire to Clearwater Baptist Church be declared void and ordered to be canceled by the clerk of this court.

2. That the deed to the South Main street lot, whereby Miss Whitmire conveyed this property to the trustee of Clearwater Baptist Church, be declared to be valid and of full force and effect. But that these trustees, upon being paid in full the amount still due on the $65,000 pledge, be required to reconvey the remaining portions of this lot to Patterson, executor.

3. That as a logical result of (2) the deed to the Standard Oil Company is specifically upheld and declared to be valid.

4. That the remaining portions of the South Main street lot are declared to be subject to the mortgage executed by the trustees to Jackson.

5. That the deed from Miss Whitmire to the trustees of Clearwater Baptist Church to the lot at the corner of Court and Fall streets should be declared to be null and void, in so far as the trustees are concerned, and that that property be declared to be the property of the estate of Miss Whitmire, subject, however, to the two mortgages executed by Miss Whitmire to the Title Guaranty & Trust Company, aggregating $10,500.

6. That the deed from Miss Whitmire to A. J. Kroelinger to the Bay street lot be declared null and void, and that that lot be declared to be the property of the estate of Miss Whitmire.

As to the law, the attorneys on both sides have furnished exhaustive briefs and cited many cases. The court has read and studied these cases. There is very little difference in the law as laid down in all of these cases. Undue influence, in its last analysis, depends upon the facts of each individual case. Some argument was had as to the burden of proof. Undoubtedly, in keeping with the general rule of law, the burden of proof is upon the one asserting the undue influence to prove it. But in the proof of this undue influence, he may so clearly establish the existence of a confiden-

tial relation as to throw the burden of proof as to a particular transaction upon the beneficiary thereof. In other words, when the complainants show that the beneficiary had stood for a considerable time in a trusted relation, and had opportunity to exercise influence, then the burden of explaining the good faith of transactions inuring to his benefit falls upon the beneficiary. Scores of cases cited by counsel sustain this general proposition. This principle of weighing evidence is recognized in other fields of law. The burden of proof on the whole case rests upon the complainants, but, when they establish the fact of confidential relations and existence of influence, the law then says to the party benefiting by these transactions: "You must, so far as these particular transactions are concerned, remove the presumption which naturally results from the gifts made to you. And you must explain that these transactions are bona fide and free from fraud and undue influence."

A few of the scores of cases cited by counsel and read by the court are referred to as being the ones especially considered by this court. Stating the general rule, we find a United States Supreme Court decision in Mackall v. Mackall, 135 U. S. 167, 10 S. Ct. 705, 707, 34 L. Ed. 84, where the Supreme Court said: "Undue influence must destroy free agency. It is well settled that in order to avoid a will on the ground of undue influence, it must appear that the testator's free agency was destroyed, and that his will was overborne by excessive importunity, imposition, or fraud, so that the will does not in fact, express his wishes as to the disposition of his property, but those of the persons exercising the influence."

We also have a case from the Circuit Court of Appeals of this circuit to guide us, Stump v. Sturm, 254 F. 535. Numerous South Carolina cases are cited. The general doctrine of this state is summed up in Du Bose v. Kell, 90 S. C. 196, 71 S. E. 371, 372: "To avoid a deed on the ground of undue influence, the evidence must show such an influence exerted on the grantor as to override his will and to make the act of executing the deed a mere mechanical performance by him of the design of the person exerting the influence, and undue influence may consist in any influence which is so far operative as to destroy free agency."

The South Carolina court has gone very far in upholding wills and conveyances provided there is a "free agency," no matter what the motive of the gift. See Farr v. Thompson, Cheves (S. C.) pages 37, 48, where the court says: "A disposition of property, though ever so capricious or unreasonable, will not be avoided on that ground alone. It is no lawful objection to a will that it does not dispense the testator's property to his relations, especially remote ones, unless deceitful arts have been used to estrange fixed affections."

As to the law regarding the burden of proof, we cite the following authorities: As a general rule the burden of proof is upon the person asserting undue influence to establish it to the satisfaction of the Court by the greater weight of the evidence, the burden remaining upon such person to the end; Anderson v. Wall, 114 S. C. 275, 103 S. E. 562; Wilson v. Wilson, 117 S. C. 454, 460, 112 S. E. 330.

We point out that in the case of gifts inter vivos the doctrine of undue influence is stronger and more rigidly applied than in the case of wills; in fact, as seen from the cases cited below, there is a difference in the *nature of the influence;* (1) as in the case of a will the legatee may have and "generally has, no part in or even knowledge of the act"; and (2) "the influence which is undue in the cases of gifts inter vivos is very different from that which is required to set aside a will. In the case of gifts inter vivos it is considered by the courts of equity that the natural influence which such relations as those in question involve, exerted by those who possess it, to obtain a benefit for themselves, is an *undue influence.*" Pressley v. Kemp, 16 S. C. 345, 346, 42 Am. Rep. 635.

The presumption of undue influence, which arises from the relation of spiritual adviser and other fiduciary relations, is discussed in Second Pomeroy's Eq. Juris. § 951: "Where an antecedent fiduciary relation exists, a court of equity will presume confidence placed and influence exerted; where there is no fiduciary relation, the confidence and influence must be proved by satisfactory extrinsic evidence: the rules of equity and the remedies which it bestows are exactly the same in each of these two cases." In such case "the doctrine of equity concerning undue influence is very broad, and is based upon principles of the highest morality. It reaches every case and grants relief *'where influence is acquired and abused,'* or where confidence is reposed and betrayed. It is especially active and searching with gifts, but is applied, when neces-

712

sary to conveyances, contracts executory and executed, and wills." Pom. Eq. Juris. § 951.

The author further says: "While equity does not deny the possibility of valid transactions between the two parties, yet because every fiduciary relation implies a condition of superiority held by one of the parties over the other in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity and casts upon that party the burden of proving affirmatively its compliance with equitable requisites, and of thereby overcoming the presumption." Section 956.

And further in the same section: "Wherever two persons shall stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, *although the transaction could not have been impeached if no such confidential relation had existed.*" (Author's italics.)

The author further says, section 956: "It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists *as a fact,* in which there is confidence reposed on one side, and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal; it may be moral, social, domestic, or merely personal." (Author's Italics.)

At section 957 it is said: "The transaction is not necessarily voidable, it may be valid; but a presumption of its invalidity arises, which can only be overcome, if at all, by clear evidence of good faith, or full knowledge, and of independent consent and action."

And in the same section the author says: "The principle is applied with *great emphasis and* rigor to gifts, whether they are simple bounties, or purport to be the effects of liberality based upon antecedent favors and obligations."

The same author, in section 963, says that the principle extends to the relation of physician, of spiritual adviser, "and indeed all persons who occupy a position of trust and confidence, of influence and dependence, in fact, although not perhaps in law."

In Devlin v. Devlin, 89 S. C. 268, 71 S.

E. 966, 968, the court says: "The principle is applicable wherever there is a relation of trust and confidence, no matter from what cause it arises." And at page 272 of 89 S. C., 71 S. E. 966, 968: "When the facts proved or the relation established raise a presumption against the validity of the transaction assailed, unless the presumption is rebutted, the transaction must fall. Hence the effect of the presumption is to shift the burden of proof."

Any further citations of authorities or extended discussion of the law would simply be repetition of well-recognized principles.

Let a decree be submitted in accordance with the views expressed in this opinion.

