Shirley ROBERTS–DOUGLAS,
et al., Appellants,

v.

John L. MEARES, et al., Appellees.

EVANGEL TEMPLE, INC.,
et al., Appellants,

v.

Shirley ROBERTS–DOUGLAS,
et al., Appellees.

Nos. 89–CV–55, 89–CV–354.

District of Columbia Court of Appeals.

Argued Nov. 7, 1991.
Decided Nov. 3, 1992.

Christopher W. Mahoney and William E. Nelson, with whom John N. Hanson, Shelley V. Lucas, and Sherlee Stanford Nelson were on the briefs, for appellants in No. 89–CV–55 and appellees in No. 89–CV–354.

B. Michael Rauh, with whom Carroll D. Hauptle, Jr. was on the briefs, for appellees in No. 89–CV–55 and appellants in No. 89–CV–354.

Before TERRY, SCHWELB, and WAGNER, Associate Judges.

SCHWELB, Associate Judge:

## I

## THE CONTROVERSY

This case involves allegations by the plaintiffs, nine former parishioners of the Evangel Temple, formerly located in northeast Washington, of fraudulent and coercive conduct on the part of leaders of the church in connection with fund-raising for a proposed new facility. In their complaint, as amended, the plaintiffs claimed that the defendants, who include the Temple, its bishop (John L. Meares), and two of Bishop Meares' sons, fraudulently induced them to contribute large sums of money to the defendants' building funds by misrepresenting the Temple's financial condition and the individual defendants' salaries, as well as the need for and intended purpose of the contributions. According to the plaintiffs, the defendants then converted some of the funds so obtained to their own personal use.

The plaintiffs further alleged that the defendants abused the positions of trust and confidence which they held as ministers and unduly influenced the plaintiffs and other parishioners into contributing many thousands of dollars, far in excess of anything most of them could reasonably afford. The defendants' coercive tactics allegedly included repeated threats of divine retribution against those who failed to pledge or contribute sufficient amounts, as well as various types of harassment, *e.g.*, singling out perceived delinquents by name and requiring them to run a humiliating gauntlet before deacons and members in good standing. In order to raise funds, according to some of the plaintiffs, the defendants incited parishioners to submit simultaneous applications for loans to several institutions without disclosing to any lender that other applications were also being made.

In their pleadings and in pretrial depositions, the defendants denied that they engaged in any fraud, coercion, or misappropriation, and contended that their conduct was protected by the Free Exercise Clause of the First Amendment. They also maintained that several of the plaintiffs were biased against them as a result of disputes over religious doctrine.

Prior to trial, the plaintiffs propounded broad interrogatories and requests for pro-

duction of documents to the defendants. The defendants objected to significant portions of the discovery, and the plaintiffs moved to compel. The trial judge granted the motion in part, but declined to compel responses to those discovery requests which related primarily to the financial condition of the individual defendants.

The defendants subsequently filed motions for summary judgment directed to all of the counts in the plaintiffs' complaint. The trial judge granted partial summary judgment as to the "undue influence" claim, in which the plaintiffs alleged that each of the defendants had occupied a position of trust and confidence vis-a-vis their parishioners and had abused that position by effectively coercing contributions from them.[1] The trial judge denied the defendants' motion for summary judgment with respect to the claims of fraud and intentional infliction of emotional distress, holding that the plaintiffs had raised genuine issues of material fact and that if the allegations in the complaint were proved, the defendants' conduct would not be protected by the First Amendment.

The case then proceeded to a non-jury trial on the fraud claims, which had sur-vived the defendants' pretrial motions. At the conclusion of the plaintiffs' case, the judge delivered a comprehensive oral opinion in which he granted judgment in favor of the defendants pursuant to Super.Ct.Civ.R. 41(b). Summarizing the testimony which he had heard and credited, including accounts of the hardships which the plaintiffs had endured in attempting to meet the defendants' demands, the judge stated that their evidence had "won my heart but not my head." The judge continued:

> These plaintiffs are unquestionably all honest, sincere, and decent people. They come from different backgrounds and circumstances, but it seems to me at least [that] what unites them in this case, and what their common denominator is, is a deep abiding faith in God and, formerly at least, in their church.
>
> It is impossible for me to listen to the testimony and not to feel tremendous sympathy for what they have gone through.

After detailing the contributions made to the Temple by individual plaintiffs and the financial sacrifices which they had felt constrained to make,[2] the judge recognized

---

1. In their undue influence claim, the plaintiffs sought restitution of the sums which they had donated, as well as compensatory and punitive damages for what they have described as the "tort" of undue influence.

2. The judge's oral findings at the conclusion of the trial included the following eloquent description of the results of the defendants' fund-raising activities:

 The Douglases are people who are not poor, but certainly people of modest means, who contributed $15,000 or more to this last fund and many many thousands of dollars to previous funds.

 The Harrisons, also not poor people, but not wealthy people either by any means, to contribute to the new church fund, went out to borrow, putting a second trust on their house, borrowed $24,000, and after all the expenses they had were paid, they wound up only with $7,000, all of which they contributed to this fund.

 Miss Cogdell, a registered nurse, and I can only guess at [what] her income was in that profession, swept away by the rhetoric and her deep religious feelings, first pledged $5,000, then doubled it to $10,000, which unquestionably she was not in a position to afford.

 And then I feel [she] probably was burdened with the guilt that she had afterwards about not being able to meet her pledge because, as Mrs. Douglas testified, if you are a Christian and you make a pledge, part of your obligation is to keep it.

 And she, perhaps more than any other plaintiff at least, insurmountably suffered genuine emotional harm, that is Miss Cogdell, necessitating some professional help.

 Miss Patty, not having any other source of funds, contributed her child support checks to the building fund. The Norrises contributed more than they were reasonably able to afford, so that Mr. Norris had to work seven days a week fourteen hours a day to make their pledge of $5,000.

 [Mrs.] Norris' sister, Miss Moreno, whose income is perhaps the most modest of all the plaintiffs, pledged $5,000 which she obviously could not afford, ran all over the place trying to borrow it from a bank, and understandably was rejected, and finally gave what she could, which was one whole paycheck for a two-week period so that at least she would be counted among the ones who had given something to this church for this project.

 And there was even testimony from Mrs. Harrison that one couple that was planning to

that it was his obligation to decide the case on the basis of the law and the evidence rather than considerations of sympathy. With apparent reluctance, he ruled for the defendants.

The judge found, among other things, that the plaintiffs had not proved by clear and convincing evidence that the defendants had misappropriated or diverted any funds or had made any false representations of fact upon which the plaintiffs had reasonably relied in contributing their money. He concluded that some of the statements which the parishioners described as fraudulent—e.g., that God would punish those who failed to make adequate contributions—were protected by the First Amendment. The judge also held that the plaintiffs had failed to make out a case of intentional infliction of emotional distress, emphasizing that no intent on the part of the defendants to cause such distress had been proved.

On appeal, the plaintiffs contend that the motions judge erroneously restricted their discovery and thereby prevented them from proving their fraud claim. They further maintain that the trial judge erred in granting the defendants' motion for summary judgment on the undue influence claim and in granting judgment for the defendants on the emotional distress claim at the conclusion of the plaintiffs' case. We agree in part with the plaintiffs' first

contention, and direct that the judge reconsider, in the light of this opinion, the denial of certain portions of the requested discovery. The judge should then reappraise the sufficiency of the evidence supporting the fraud claims in light of any new proffer by the plaintiffs, based on any new responses by the defendants to such discovery and determine if the record should be reopened. With respect to the plaintiffs' second contention, we agree with the trial court's rejection, on these facts, of the claim of a "tort" of undue influence. We hold, however, that a gift *inter vivos*, like a testamentary disposition, may be set aside on equitable grounds on the basis of undue influence. In that connection, we reverse the order granting partial summary judgment on the undue influence count against plaintiffs Mae and Daniel N. Harrison, but affirm the summary judgment entered against the remaining seven plaintiffs. We also affirm the trial judge's entry, at the conclusion of the plaintiffs' case, of judgment in favor of the defendants on the claims by all plaintiffs of intentional infliction of emotional distress.[3]

## II

### THE FACTS[4]

Evangel Temple is a District of Columbia corporation organized for religious and ed-

---

get married, not among the plaintiffs I guess, gave over their wedding rings for their contributions to this fund.

**3.** The defendants requested sanctions against the plaintiffs pursuant to Super.Ct.Civ.R. 11, claiming *inter alia* that the lawsuit as a whole was frivolous and that there was no basis for the plaintiffs' initial request for class certification. The trial judge denied sanctions in a written order, and the defendants now seek reversal of that decision, as well as costs pursuant to D.C.App.R. 38 for an assertedly frivolous appeal. We find these contentions wholly devoid of merit, reject the notion that the judge applied a superseded and incorrect standard, affirm the judge's order denying sanctions against the plaintiffs, and decline to impose sanctions against the plaintiffs in connection with their appeal.

The plaintiffs have also sought sanctions against the defendants, claiming that the defendants' appeal from the trial judge's order denying sanctions against the plaintiffs was frivo-

lous. The plaintiffs' request for such relief is perhaps slightly more meritorious than the defendants' requests, but not meritorious enough. It is likewise denied.

**4.** As noted above, the parishioners' undue influence claim was dismissed before trial as a result of the trial judge's having granted in part the defendants' motion for summary judgment. The claims of fraud and emotional distress, on the other hand, were disposed of after the judge heard the plaintiffs' case at trial. As a result of this difference in disposition, the appellate record with respect to the undue influence issue is not the same as the record applicable to the two claims as to which evidence was heard.

Although the parties have not distinguished in their briefs between the record on the summary judgment motion and the trial record, we are, of course, required to evaluate the propriety of the award of partial summary judgment by looking only at the record that was actually before the trial judge at the time he considered that mo-

ucational purposes. It is governed by a Presbytery composed of ministers and headed by Bishop Meares. The Presbytery holds title to all church property and governs the religious and temporal affairs of the church through a Council comprised of all elders, ministers, and deacons.

The activities of Evangel Temple are financed largely by the members of the congregation, for financial contributions to support the Temple's activities are an integral obligation of membership under the Temple's corporate charter and by-laws.[5] Members not only tithe, by contributing a set proportion of their income to the church, but are also expected to donate to designated projects. In 1975, the Temple was able to establish its home on Rhode Island Avenue in northeast Washington by means of donations from its members.

By the mid–1980's, according to the defendants, the membership of Evangel Temple had grown substantially, and a larger facility was needed for worship and for various new programs. Between July and September of 1985, the church elders began organizing a building fund designed to enable them to construct a large new facility in Largo, Maryland. This facility was to include not only a new church, but also television facilities, a school, a gymnasium, and homes for church leaders. Most or all of the plaintiffs participated in the fund-raising programs which followed.

The controversy in this case centers upon the means used by church leaders, and by Bishop Meares and his two sons in particular, to obtain contributions to the building fund. The plaintiffs have characterized the defendants' fund-raising techniques as a "campaign of humiliation, insult, harassment and intimidation against them." They have alleged that contributions were secured by coercion and undue influence, and that the defendants misrepresented the financial circumstances of the Temple and of the individual defendants, the size of the contributions made by church leaders to the building funds, and the use which was to be made of the money.[6]

In connection with their allegations of coercive tactics, the plaintiffs claimed that they were told by church leaders that Bishop Meares represented the "voice of God," and that what he said should not be questioned. Claiming divine inspiration for his statements, Bishop Meares announced that God required each parishioner who was gainfully employed to give $5,000 to the

---

tion. *McCoy v. Quadrangle Dev. Corp.,* 470 A.2d 1256, 1259 (D.C.1983). In the description of facts which follows, we have therefore confined ourselves, at least insofar as the undue influence claim is concerned, to the sworn allegations of fact which appear in the verified complaint and in the affidavits, depositions, answers to interrogatories and other materials which accompany their opposition to the church's multiple motions for summary judgment. In this connection, we accept the representations made by the plaintiffs in their post-argument filings with this court that these documents had been served on the defendants and were before the judge and considered by him at the time that he ruled on the motion for partial summary judgment. The defendants have not opposed our doing so.

5. *See* Constitution and By–Laws of Evangel Temple, Article III, Section 16:
We believe that the tithe of our earnings is Holy unto God, and is the offering up by faith of the first fruits of our increase. We believe that tithing and giving is to be practiced continually by all believers and is an outward expression of the unity of the Church, the

Body of Christ, as it joins together in support of the work of the Lord. Gen. 14:20; Lev. 27:30–32; Num. 18:26; Mal. 3:8–10; Matt. 23:23; Rom. 12:8; I Cor. 9:7–14; 16:1–3; Heb. 7:4–10.
The Articles require, as a covenant of membership in good standing, "[t]he willing support of the work and ministry of the church by the systematic giving of tithes and offerings, and a conscientious effort to be present in the regular meetings of the church. Mal. 3:8–10; Rom. 12:8; I Cor. 9:1–14; Matt. 18:20; Hebrews 10:25." Constitution and By–Laws, Membership Covenant.

6. The trial judge found that the plaintiffs had failed to prove by clear and convincing evidence that the defendants had made fraudulent representations. On appeal, the plaintiffs do not contest this finding, and argue only that the motions judge denied them a fair opportunity to prove fraud by denying them discovery to which they claim to have been entitled. In light of the posture of the fraud claim, we do not address in detail the specifics of the plaintiffs' allegations in regard to it.

building fund within five months.[7] When this doctrine was first presented to the deacons at a special retreat, they were given thirty minutes to decide whether they would pledge the required amount. Bishop Meares threatened that if they did not do so, God would curse them, kill them, or "turn His back" on them.

According to the plaintiffs, parishioners who had not given enough money to the building funds were publicly identified by name during church services and were made to stand and to walk a gauntlet in disgrace between two lines of deacons. Those parishioners who had met their pledges were directed to "lay hands" upon those who had not as the latter passed through the gauntlet, and each delinquent member was required, when he or she reached the end of the line, to make a public pledge to give the amount demanded. Anyone who declined to do so would be ordered to leave the church, in disgrace, by the front door.

According to the plaintiffs, the church leaders had little regard for the practical ability of their parishioners to make the contributions required of them. The plaintiffs alleged that the Bishop, crying and emotional, announced that in light of God's will, church leaders were not going to listen to people complaining about not being able to obtain the money. Those parishioners who claimed to be unable to contribute the amounts demanded of them were admonished that it was the will of God that they "borrow or sell," *i.e.*, borrow large sums of money from as many lenders as possible, or sell all of their worldly possessions, including their homes if necessary. One of the plaintiffs, Mrs. Mae Harrison, swore that Donald Meares visited her home and personally insisted that she and her husband, plaintiff Daniel N. Harrison, sell it. With respect to the directive that parishioners borrow money in order to meet their pledges, one of the elders insisted that loans should be obtained regardless of the interest rate, because "God will take care of that." [8]

The pressures allegedly placed on the plaintiffs and others to obtain the amounts demanded by church leaders included directives to apply for multiple loans. Parishioners were told to go to as many lending institutions as possible to obtain loans with which to meet their pledges; they were ordered not to inform any of the lenders that similar loan applications had been made elsewhere. Bishop Meares publicly commended one couple for obtaining six different loans on the same day, thus collecting $20,000.

Deacons of the church, including the Douglases and the Harrisons, who did not make the required contributions, or who questioned what was being done with the money raised, were threatened with dismissal and excommunication. Several parishioners were publicly denounced. Mrs. Roberts–Douglas related that after she requested an accounting, she was summoned before a church tribunal in the middle of the night. She alleged that at this nocturnal proceeding she was excoriated for her defiance of church directives and threatened with expulsion and damnation. A little over a month later, Mrs. Roberts–Douglas and her husband were expelled from membership in the Temple.

Most of the parishioners, according to the plaintiffs, were of modest means, and the amounts pledged and contributed by them were out of proportion to what they could reasonably afford.[9] Mrs. Roberts–Douglas alleged that she, her husband, and

---

7. The requirement was originally described as $5,000 per family, but promptly changed to $5,000 per employed adult.

8. According to plaintiff Shirley Roberts–Douglas, the elder stated: "You're to go out and get the loans and don't worry about the interest— take it even if the interest [is] 16% or 17%; God will take care of that." Mrs. Roberts–Douglas stated that, at that time, interest rates were approximately 9%.

9. See also note 2, *supra*. The difference between the recitation in note 2 and in the text accompanying this footnote is attributable to the fact that Judge Weisberg's findings were made on the basis of the trial record, while the facts related above are derived from the materials before the judge when he decided the motion for summary judgment.

their children together contributed $24,000 to the building fund over and above their regular tithes and other payments to the church. Mr. and Mrs. Harrison—the couple whom Elder Donald Meares had importuned in their kitchen to sell their home—did not sell, but instead obtained a second mortgage on their house to raise $7,900, which they contributed to the fund. This required them to struggle to make the additional monthly payment of $298 on their home mortgage. Ms. Katherine Cogdell, a registered nurse, allegedly contributed $2,000 to the building fund. Ms. Gloria Patty, not having any other source of funds available, is alleged to have included child support checks in her $2,000 contribution to the building fund. Kenneth and Frances Norris contributed $10,439 and, in the process, went into such dire financial circumstances that Mr. Norris had to begin working 100 hours a week. Ms. Mary Lou Moreno, who had a salary of only $10,000 a year, testified at her deposition that she felt so pressured and "brainwashed" by the defendants' demands for money, which were accompanied by repeated threats of divine retribution, that she pledged $5,000 to the building fund. Unable to obtain loans to pay that amount, she turned over her entire paycheck for a two-week period.

The defendants have provided an entirely different account of the disputed events. They have denied that they engaged in any fraudulent behavior or that they unduly influenced any parishioner to pledge or contribute to the building fund. Bishop Meares testified on deposition that those who contributed "came gladly, joyfully, and said yes, it is God's will for me to give $5,000, $10,000, $20,000 and $30,000 and $50,000 and $100,000.... And our people

are in their right mind, okay. So people in their right mind don't jump up and joyfully pledge money like that without a conviction." One of the bishop's sons, Elder Donald Meares, testified that

> I don't think as a pastor we manipulate or dominate anyone. Our responsibility was to give direction as to what we believed.... I would like to add that there are those people in our congregation that have not [given $5,000], and that's their choice, as well as there were a lot of people that made what I and the elders considered very unrealistic pledges that we had to counsel, that they were unrealistic, why the figure was high in total as it was, because some people I think pledged out of an emotional basis.

This was how the battle lines were drawn when the judge considered the motion for summary judgment.

## III

## THE CLAIM OF FRAUD AND THE DISCOVERY ISSUE

*A. General Considerations.*

■ In his oral decision granting judgment to the defense on the plaintiffs' claim of fraud, the trial judge analyzed that claim as embracing four separate categories of fraudulent misrepresentation.[10] After discussing in some detail the evidence applicable to each category, the judge concluded that the plaintiffs had failed to prove by clear and convincing evidence that the defendants had engaged in any kind of fraud. On appeal, the plaintiffs do not challenge the judge's ruling that the evidence of fraud was insufficient,[11] but con-

---

**10.** These categories consisted of (1) alleged misrepresentations of fact regarding the defendants' financial condition; (2) allegedly false "statements of faith," *e.g.,* that it is the word of God that parishioners must sell their homes and contribute thousands of dollars to the building fund; (3) alleged misrepresentations of the purpose for which contributions were to be used, together with the misappropriation of the funds raised; and (4) alleged "cult-like" representations regarding the steps parishioners were to take to raise the money. The fourth category may reasonably be analyzed as relating more to

the claim of undue influence than to the allegations of fraud.

**11.** The plaintiffs do challenge the judge's ruling that they failed to prove intentional infliction of emotional distress. This tort requires proof that the defendant purposely caused so acute a disturbance of another's mental or emotional tranquility that harmful physical consequences might result. *Clark v. Associated Retail Credit Men,* 70 App.D.C. 183, 186, 105 F.2d 62, 65 (1939). The judge's finding that no such intent was established was not clearly erroneous. *See* Super.Ct.Civ.R. 52(a).

tend that they were effectively precluded from proving certain of these claims because the motions judge had erroneously denied their motion to compel discovery. We agree with the plaintiffs regarding the relevance of some of the discovery, but disagree with them as to the proper remedy.

Before trial, the plaintiffs served the defendants with interrogatories and with several requests for production of documents. The defendants objected to a substantial number of the plaintiffs' requests and refused to comply with them. The plaintiffs then filed a motion to compel discovery. On November 3, 1987, the motions judge entered an order granting the plaintiffs' motion in part, "subject to a confidentiality agreement to be worked out between counsel." By implication, the motions judge denied the motion to compel discovery as to the remaining items. The plaintiffs now appeal from portions of this partial denial of their requested discovery.[12]

In order to understand the contentions of the parties with respect to the discovery issue, it is necessary to distinguish the materials as to which discovery was ordered, which we will call Category A, and those as to which it was implicitly denied, which we will call Category B. Category A included all financial statements of Evangel Temple, all records reflecting the receipt and expenditure of church funds, the amount and purpose of each expenditure and the person to whom it was paid, the identities of the members of Evangel Temple, the number and identities of persons making pledges to the building funds, the amounts pledged, all requests by contributors for return of their money, and the identities of financial institutions at which Evangel Temple deposited its money. Category B included information relating to the financial condition of each individual defendant.

In her written order, the judge gave no indication as to why she had denied the motion with respect to information in Category B. The defendants contend, however, that her decision should be sustained for three reasons:

1. the information sought was relevant only to the issue of punitive damages, and its production could therefore properly be deferred until after a determination of liability;

2. the plaintiffs were allegedly attempting to try their case in the press, and would have improperly publicized any information secured through discovery regarding the individual defendants' financial affairs; and

3. the plaintiffs failed to examine the documents in Category A which the defendants did produce for inspection.

We address each of these contentions in turn.

### B. Relevance to the Subject Matter.

The information regarding the financial condition of the individual defendants was concededly relevant to a remedial issue, namely, the amount of punitive damages that should be awarded if liability for such damages were imposed. *See, e.g., Robinson v. Sarisky,* 535 A.2d 901, 907 (D.C. 1988). Indeed, the judge ruled that this information would have to be disclosed if the plaintiffs established liability. We hold, however, that the significance of the requested information was not limited to punitive damages; it was also relevant to the issue whether the defendants had engaged in fraudulent misrepresentation.[13]

In general, parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject mat-

---

**12.** Specifically, the plaintiffs ask us to require the defendants to respond to interrogatories and produce documents and records relating to (1) the individual defendants' business interests; (2) the transfer of any moneys raised for the building fund outside the District of Columbia, Prince Georges County, and the United States; (3) the salaries and benefits of individual defen-

dants since 1975; and (4) the net worth of each individual defendant since 1975.

**13.** The judge's apparent misconception that this information was relevant only to punitive damages flawed her exercise of discretion and reduced the measure of deference that this court must accord to that exercise. *In re J.D.C.,* 594 A.2d 70, 75 (D.C.1991).

ter of the action. Super.Ct.Civ.R. 26(b); *Dunn v. Evening Star Newspaper Co.,* 232 A.2d 293, 295 (D.C.1967). Rule 26(b) specifically provides that it is no ground for objection that the matter sought will be inadmissible at trial, if it appears reasonably calculated to lead to the discovery of admissible evidence. "Relevancy to the subject matter is construed most liberally, to the point that discovery should be granted where there is any possibility that the information sought may be relevant to the subject matter of the action." *Dunn, supra,* 232 A.2d at 295. Discovery rulings are confided to the discretion of the trial court, but that discretion must be exercised in conformity with these principles. *Id.* at 295–96.

■ In the present case, the plaintiffs have alleged fraudulent conduct which is said to have included both misrepresentation and misappropriation. The claim of misrepresentation is based in part on the plaintiffs' allegation that Bishop Meares and his sons falsely represented to their parishioners that the church and its leadership were in dire economic straits and in desperate need of money. The plaintiffs claimed, in fact, that the defendants misrepresented the earnings of the individual defendants, and that they concealed from the parishioners that apparently generous pledges and contributions by Bishop Meares were in fact being offset at the Temple's expense (*e.g.,* by the Temple's purchase of a new home for the bishop in Largo, Maryland for $300,000). In effect, according to the plaintiffs, the defendants pretended that they were making financial sacrifices which they were not in fact making, depicted themselves as being worse off financially than they really were, and engaged in this deceptive conduct in order to induce the plaintiffs to make contributions

which the plaintiffs could not reasonably afford to make.

In the context of these allegations, we are satisfied that interrogatories and requests for production of documents relating to the financial situation of Bishop Meares and his sons, were reasonably likely to lead to the discovery of admissible evidence. *Cf. Ambassador College v. Geotzke,* 675 F.2d 662, 663–65 (5th Cir. 1982), *cert. denied,* 459 U.S. 862, 103 S.Ct. 138, 74 L.Ed.2d 118 (1982). One reason which the trial judge gave for granting judgment for the defendants on the plaintiffs' claims of fraud and misappropriation was that the plaintiffs had failed to produce evidence showing that any of the defendants had diverted to their personal use funds which had been contributed to the Temple for charitable purposes.[14] Although the judge did not explicitly address the point, the plaintiffs were likewise unable to prove that the individual defendants had lied about their own financial condition. Without the discovery which the motions judge had denied, however, the plaintiffs had no readily direct access to information regarding the individual defendants' financial circumstances. Such information would potentially shed light on the question whether these defendants had attempted to induce contributions by misrepresenting their own circumstances, and in effect by urging parishioners to emulate noble deeds which were never really done.

## C. Concerns Regarding Disclosures to the Press.

■ The defendants also seek to sustain the motions judge's refusal to order discovery of the Category B materials upon the ground that the plaintiffs were allegedly attempting to try their case in the press, and that disclosures about the individual defendants' financial condition would there-

---

**14.** In his order granting judgment to the defendants at the conclusion of the plaintiffs' case-in-chief, the trial judge held that

> there is no evidence before me of any kind that one penny of the money that was solicited for this project ... went for purposes other than those [for] which they were solicited.

> It's possible that it did not but plaintiffs bear the burden of proving that claim by clear and convincing evidence.... [T]here is not any evidence at all of any kind before me that this money has been misspent or misappropriated by any of the defendants in this action.

fore have threatened to bring about unwarranted intrusions into their privacy. Denial of discovery of information relevant to the subject matter of the action, however, is not an appropriate remedy for the alleged conduct on the part of the plaintiffs of which the defendants complain.

Superior Court Civil Rule 26(c) authorizes the trial court to grant a protective order "for good cause shown." "To prevent abuse of the discovery process, the order may impose specific terms and conditions for discovery and may require that confidential information be disclosed in a certain manner, or not be disclosed at all." *Mampe v. Ayerst Labs.*, 548 A.2d 798, 803 (D.C.1988); *see also Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34–36, 104 S.Ct. 2199, 2209–10, 81 L.Ed.2d 17 (1984). Indeed, the motions judge directed the parties to attempt to negotiate an appropriate "confidentiality agreement" with respect to the Category A information as to which she ordered disclosure. There are no findings in the record to suggest that anything more drastic than that was or could be warranted with respect to Category B.

### D. The Plaintiffs' Failure to Inspect Category A Documents.

■ The defendants also contend that they produced for inspection by opposing counsel those Category A records and documents as to which the motions judge granted the plaintiffs' motion to compel discovery, but that opposing counsel never examined these records. At argument, the plaintiffs' counsel conceded that this was true.

Although, to put it charitably, there is little to commend a practice of demanding access to records and documents and of then ignoring them after they have been duly produced for inspection and copying,[15] the plaintiffs' unorthodox approach to the Category A records is essentially irrelevant to their right to receive Category B infor-

mation, at least in the absence of overlap between the two groups. Whether or not the plaintiffs made use of available information relating to one set of issues, they had the right to receive relevant information on other issues. The defendants have provided us with no authority for the proposition that discovery to which the plaintiffs were otherwise entitled may be denied for reasons relating to the manner in which they exercised (or, in this case, failed to exercise) other discovery rights. Moreover, absent a crystal ball, the motions judge could not have based her denial of access to Category B information on the plaintiffs' failure to inspect Category A records, for that conduct had not yet occurred at the time of her order.[16]

We note, at the same time, that the defendants are obviously under no obligation, simply because the plaintiffs have failed to exercise their rights, to produce something for the plaintiffs' inspection more than once. If it is established to the satisfaction of the trial judge that any Category B records now sought by the plaintiffs were made available under Category A, but not inspected or copied, the judge may exercise his or her discretion accordingly.

### E. The Remedy.

■ The plaintiffs have taken the position that if the motions judge's discovery order was erroneous, then they are entitled to a new trial on their claims of fraud. Such a remedy would, however, be out of proportion to the error. A more balanced disposition, under the circumstances of this case, is to remand the case to the trial court with directions to reconsider the plaintiffs' motion to compel discovery, see note 12, *supra*, in conformity with our holding that information as to each individual defendant's financial condition is relevant not only to the issue of punitive damages, but also to the question of liability,

---

**15.** No costs or other sanctions were requested by defendants in this regard. See note 3, *supra.*

**16.** The motions judge did not specify in her order that the plaintiffs should first inspect Category A records and then determine whether to seek further discovery as to Category B. We

need not and do not decide whether a different result would be appropriate if the judge had structured her order in this way, and if she had thus required the plaintiffs to proceed with discovery one step at a time.

and specifically to the merits of the claim of fraudulent misrepresentation.

While holding that the subjects embraced by the plaintiff's motion to compel were relevant, we leave to the trial court the initial balancing of the interests involved. In the trial court, the defendants made a generalized objection that the proposed discovery was unduly intrusive, burdensome and oppressive. *See* Super.Ct.Civ.R. 26(c). Conclusory assertions of this kind are insufficient. *Lewis v. Capital Mortgage Investments*, 78 F.R.D. 295, 311 (D.Md.1977); *Klausen v. Sidney Printing & Publishing Co.*, 271 F.Supp. 783, 784 (D.Kan.1967); *see generally* 4 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE, § 26–69, at 26–435 (2d ed. 1991). In the present case, however, the trial judge never explicitly addressed the question of intrusiveness and burdensomeness or its interplay with relevance. A demand for all of an individual's financial records for a significant period of time is potentially intrusive. Since the motions judge did order the defendants to provide (in Category A) a significant amount of information from which the individual defendants' dealings with the Temple might be traceable, the plaintiffs' need for the information was arguably less compelling. Given the availability to the plaintiffs of Category A records, the judge may well find it unnecessary to order all of the extensive discovery, some of it going back seventeen years, which the plaintiffs now seek as to each individual defendant. Especially in the context of a case of this kind, in which issues of religious liberty are potentially implicated, the court should, "screen out irrelevant, broad based discovery when the answers might implicate [the defendants'] constitutional rights." *Geotzke, supra,* 675 F.2d at 665.

Once the trial judge has balanced, in conformity with this decision, the interests implicated by the plaintiffs' motion to compel discovery, he or she should order the defendants to make any appropriate response. After any further answers to interrogatories have been provided, and after any appropriate records and documents have been produced,[17] the plaintiffs should be given the opportunity to proffer any new evidence they believe would further substantiate their claims of fraud. The trial judge should then determine whether the evidence presented at trial, as supplemented by any newly-proffered evidence, has the potential to survive a defense motion pursuant to Super.Ct.Civ.R. 41(b). If the new materials have no such potential, the judge may reaffirm his prior decision, but should make a sufficient assessment of any newly-proffered evidence to render his ruling amenable to appellate review. If renewed discovery does provide information which might affect the result, the trial judge should reopen the record and receive the newly available evidence or, if necessary, order a new trial on the claim of fraud.[18]

## IV

### THE CLAIM OF UNDUE INFLUENCE

#### A. *The Trial Court's Order Granting Partial Summary Judgment.*

In a written order entered on October 7, 1988, the trial judge granted summary judgment in favor of the defendants dismissing Count II of the complaint. In that count, the plaintiffs sought the return of the moneys they had contributed to the building fund, alleging that the defendants had "abused the relationship of trust and confidence between minister and congregation" and that the money had been procured through "duress, coercion, and undue influence." The plaintiffs also prayed

---

**17.** We leave to the trial court in the first instance the determination whether further discovery should be authorized in light of any new information provided in the defendants' responses.

**18.** In determining whether a new trial is warranted, the trial judge will, of course, be obliged to consider whether the plaintiffs have made an adequate proffer as to a causal connection between any misrepresentation and the contributions alleged to have been fraudulently induced. The lack of any sufficient evidence to that effect has led to our affirmance of summary judgment of the defendants against most of the plaintiffs on the undue influence claim. See Part IV E, *infra.*

that they be awarded interest, punitive damages, and counsel fees. Treating this claim solely as one purporting to allege an independent tort, the judge held that it was subsumed in substantial part by the plaintiffs' claims of fraud and of intentional infliction of emotional distress. To the extent that it was not so subsumed, the judge concluded that insufficient facts were alleged to defeat the defendant's motion.

The judge observed that in this jurisdiction, the "tort" of undue influence had been recognized only in the context of challenges to wills. Turning to the law of other jurisdictions, the judge stated that "the claim has invariably included an element of a one-on-one relationship in which the donor was in a position of weakness," whereas in the present case "all of the alleged solicitations took place in large groups, as part of an actual church service or at retreats or similar religious meetings." Apparently on account of the lack of such "one-on-one" contacts, the judge also ruled that the defendants "were not fiduciaries when the contributions in question were solicited," even though "they may be fiduciaries with respect to the disposition of money collected...." Finally, the trial judge wrote, the record on the motion for partial summary judgment "demonstrates that plaintiffs cannot prove that they were unduly influenced in the sense required for recovery under that tort theory," because the plaintiffs had failed to allege that the defendants' activities actually influenced their decisions to contribute to the fund.[19]

■ On appeal from an award of summary judgment, we review the record *de novo*. *Williams v. Gerstenfeld*, 514 A.2d 1172, 1175 (D.C.1986). We must examine the verified complaint, answers to interrogatories, depositions and affidavits, to determine whether there is a genuine issue of material fact. *District of Columbia v. Gray*, 452 A.2d 962, 964 (D.C.1982). We construe these materials in the light most favorable to the non-moving party, resolving in that party's favor any doubt as to the existence of a factual dispute. *Swann v. Waldman*, 465 A.2d 844, 846 (D.C.1983).

### B. The Nature and Elements of Undue Influence.

■ It is axiomatic that a gift or bequest must be free and unconstrained. If the recipient has obtained property by unduly influencing the donor, the conveyance is invalid and must be set aside. *Hurd v. Cramer*, 40 App.D.C. 349, 369–70, *cert. denied*, 229 U.S. 623, 33 S.Ct. 1051, 57 L.Ed. 1356 (1913).

"The duty of [distinguishing] freedom of will on the one hand [from] 'undue influence' on the other is extremely difficult." *Whitmire v. Kroelinger*, 42 F.2d 699, 704 (W.D.S.C.1930). We have held, in the context of will contests, that undue influence consists of "physical or moral coercion that forces the testator to exercise the judgment of another rather than his own." *Estate of Broun v. Broun*, 413 A.2d 1310, 1313 (D.C.1980). "To constitute undue influence, the pressure on the testator must destroy his agency and free will." *Himmelfarb v. Greenspoon*, 411 A.2d 979, 984 (D.C.1980).

■ "It is not influence, but undue influence, that is ... necessary to overthrow a will." *Beyer v. LeFevre*, 186 U.S. 114, 124, 22 S.Ct. 765, 769, 46 L.Ed. 1080 (1902). "Undue influence is influence gained by improper means." *In re Estate of Weir*, 154 U.S.App.D.C. 404, 408, 475 F.2d 988, 992 (1973). As the court stated in *MacMillan v. Knost*, 75 U.S.App.D.C. 261, 262, 126 F.2d 235, 236, *cert. denied*, 317 U.S. 641, 63 S.Ct. 32, 87 L.Ed. 516 (1942), quoting with approval the trial court's jury instruction,

'[o]ne has the right to influence another to make a will in his favor. He may ... lay his claims for preferment before the testator. They may be based on kinship or friendship or kindness or service or

---

**19.** The judge considered, as a backdrop for his disposition of the motion, the protection which the First Amendment accords to the free exercise of religion and the implications for those protections of any decision imposing liability against the Temple on an undue influence theory. He addressed the "free exercise" question in considerably greater detail in his oral decision at the conclusion of the trial.

need or any other sentimental or material consideration. One can use argument and persuasion so long as it is fair and honest and does not go to an oppressive degree where it becomes coercive.'

Legitimate persuasion ends, however, and undue influence begins, when the free agency of the donor has been destroyed, so that the conveyance is effected by the will of the donee, not of the donor. *Nelson v. Dodge,* 76 R.I. 1, 68 A.2d 51, 57 (R.I.1949), *see* 3 JOHN NORTON POMEROY, EQUITY JURISPRUDENCE, § 951, at 780 n. 2 (5th ed. 1941); *see also Himmelfarb, supra,* 411 A.2d at 984.

Although, as the trial judge noted, the concept of undue influence has been recognized in this jurisdiction only in the context of challenges to wills, we now join courts elsewhere which have recognized that its logic applies to gifts *inter vivos* as well. *See, e.g. O'Hearn v. O'Hearn,* 327 Mass. 242, 245, 97 N.E.2d 734, 735 (1951); *Nelson, supra,* 68 A.2d at 57 (invalidating gifts to church secured by undue influence). In fact, the burden on the plaintiffs may be less onerous here than it would be if they were challenging a testamentary disposition. In *Whitmire, supra,* 42 F.2d at 711, the court stated that "in the case of gifts *inter vivos* the doctrine of undue influence is stronger and more rigidly applied than in the case of wills." In *First Christian Church v. McReynolds,* 194 Or. 68, 72, 241 P.2d 135, 137 (1952), the court observed that "[a] grantor is required to possess greater competency in the execution and delivery of a deed than a testator is required to possess in executing a will.... Generally, a grantor, unlike a testator, must cope with another party to the transaction, that is, with a grantee." (Citations and internal quotation marks omitted.) *See also* 3 POMEROY, *supra,* § 951, at 779 (doc-

trine of undue influence is "specially active and searching in dealing with gifts").

Exaction of a bequest or gift through undue influence is undoubtedly a wrongful act. Nevertheless, we agree with the trial judge that no separate "tort" of undue influence has been recognized in this jurisdiction or, so far as we are aware, in any other. We are not disposed to create such a novel cause of action by judicial fiat. On the other hand, the courts have long recognized the doctrine of equitable restitution, which provides that "where a gift is obtained by fraud, undue influence, or imposition exerted by the donee, the donor may recover it on the principle that no man should be permitted to secure any benefit from his own wrongful act." *Myers v. Myers,* 185 Md. 210, 219, 44 A.2d 455, 459 (1945);[20] *see also Hurd, supra,* 40 App. D.C. at 369–70, *cert. denied,* 229 U.S. 623, 33 S.Ct. 1051, 57 L.Ed. 1356 (1913); Annotation, *Undue Influence in Nontestamentary Gift to Clergyman, Spiritual Adviser, or Church,* 14 A.L.R.2d 649, 651–53 (1950 & Supps.1987 & 1991) [hereinafter *Undue Influence* ]. This is the pith and substance of the plaintiffs' undue influence claim here; they have asked for return of their contributions, upon the ground that the money was secured from them by undue influence through the abuse of what they allege to have been a confidential relationship.[21]

Finally, there are significant differences between fraud and undue influence, even though the two concepts sometimes co-exist, and even though they are sometimes loosely lumped together. As the Supreme Court of the District of Columbia recognized more than a century ago, undue influence and importunity, sufficient to invalidate a will, may be exercised without the existence of fraud. *Stewart v. Elliott,* 13 D.C. (2 Mackey) 307, 319 (1883).

---

**20.** Because District of Columbia common law is derived from Maryland law, decisions of the Court of Appeals of Maryland, and particularly those relating to the law of property, are accorded the most respectful consideration by our courts. *See In re Estate of Parnell,* 275 F.Supp. 609, 610 (D.D.C.1967); *Tydings v. Tydings,* 567 A.2d 886, 893 n. 1 (D.C.1989) (concurring opinion).

**21.** To the extent, if any, that the plaintiffs seek legal rather than equitable relief for "undue influence," we know of no authority for awarding it. We do not read the complaint as fairly alleging the tort of conversion.

"Fraud ... is characterized by false representations, concealment, or deception, whereas there may be undue influence although all facts are truly represented and full disclosure of them [is] made." 25 AM. JUR. 2D *Duress and Undue Influence* § 35, at 396 (1966). Unlike fraud, "undue influence need not be attended at all with deception or circumvention." *Gockel v. Gockel*, 66 S.W.2d 867, 870 (Mo.1933) (citation and internal quotation marks omitted); *see also* 2 POMEROY, *supra*, § 951, at 780 n. 2.

## C. Indicia of Undue Influence.

### (1) General considerations.

■■■ The critical question presented by the pretrial demise of the plaintiffs' claim of undue influence is whether the materials produced by the plaintiffs in opposition to the defendant's motion for summary judgment, viewed in the light most favorable to the plaintiffs, raised one or more triable issues of material fact precluding the entry of judgment pursuant to Super.Ct.Civ.R. 56. This determination is to be made in light of the totality of the circumstances. As the court stated in *Guill v. Wolpert*, 191 Neb. 805, 821, 218 N.W.2d 224, 234 (1974) (quoting *Cunningham v. Quinlan*, 178 Neb. 687, 689–90, 134 N.W.2d 822, 823–24 (1965)),

> [i]t is impossible to lay down any hard and fast rule in cases of this kind as to when a presumption of undue influence arises. The rule must of necessity be applied according to the particular facts and circumstances of each case in which the question arises.

Maintaining that the materials which they submitted in opposition to the defendants' motion for summary judgment were sufficient to defeat it, the plaintiffs rely on several alleged indicia of undue influence. They claim, in particular, that the relationship between them as parishioners and the defendants as clergymen was one of trust and confidence, and that the defendants betrayed that trust. They point to specific practices of the defendants—*e.g.*, the public subjection of delinquent parishioners to a gauntlet of deacons and the advocacy of apparent deception in securing multiple loans—as supportive of their claim. Finally, they allege that they contributed amounts far in excess of what they could reasonably afford, and suggest that undue influence may be inferred from this lack of proportionality.

The defendants, as we have noted, deny any impropriety. They reject both the plaintiffs' contention that the relationship between the parties was one of trust and confidence and the accusation that they betrayed the plaintiffs' trust. The defendants also contend that, as the trial judge stated, the alleged solicitation took place from the pulpit or in large groups, without any showing of a "one-on-one relationship in which the donor was in a position of weakness." Under these circumstances, according to the defendants, all of their alleged activities were protected by the First Amendment. The defendants also ask us to sustain the judge's ruling that the plaintiffs had failed adequately to allege that the defendants' purportedly coercive practices actually induced the plaintiffs to make the contributions which they now seek to revoke.

### (2) The existence or non-existence of a confidential relationship.

■■■ The trial judge, as we have noted, held that the defendants were not the plaintiffs' fiduciaries in connection with the solicitation of the contributions in question. We agree with this assessment, but it is not necessarily conclusive. The term "confidential relationship," as used in this context, embraces "both technical fiduciary relations and those informal relations which exist when one man trusts and relies upon another." *First Christian Church v. McReynolds, supra*, 194 Or. at 82, 241 P.2d at 142.

■■■ "Confidential relations existing between the testator and beneficiary do not alone furnish any presumption of undue influence." *MacMillan, supra*, 75 U.S.App.D.C. at 262, 126 F.2d at 236. Nevertheless, "[i]t generally takes less to establish undue influence when a confidential relationship exists between the parties." *In re The Bible Speaks*, 869 F.2d 628, 641

(1st Cir.) (citations and internal quotation marks omitted), *cert. denied*, 493 U.S. 816, 110 S.Ct. 67, 107 L.Ed.2d 34 (1989). Where such a relationship is implicated, the validity of a purported gift is closely scrutinized. *Barrineau v. Brown*, 240 Ark. 599, 607, 401 S.W.2d 30, 34–35 (1966). Indeed, a gift may be set aside under such circumstances even though the transaction could not have been impeached in the absence of a confidential relationship. *See generally* 3 POMEROY, *supra* note 24, § 956, at 792. This is true even where the donee is not technically the donor's fiduciary. *Frame v. Bauman*, 202 Kan. 461, 467–68, 449 P.2d 525, 532 (1969). The concept of trust and confidence as between donor and donee is a broad one, and courts of equity exercise appropriate vigilance even where the relationship between them is not a legal one but merely moral, social, or personal. *See, e.g., LaForest v. Black*, 373 Mich. 86, 92, 128 N.W.2d 535, 538 (1964).

■■■■■ As stated in a case in which the court found that undue influence had been exercised by a member of the clergy, "the utmost good faith must be shown by one in a confidential relation, even though not technically a fiduciary, in order to support a gift of money or anything of value from another who has reposed the trust and confidence." *Nelson, supra*, 68 A.2d at 57. Moreover, if undue influence is established, "it is not at all necessary to show that the benefit from the gift inured to the spiritual adviser personally to render it void." *Id.* As the court stated in a British case decided more than 130 years ago,

> [n]o person who stands in a relation of spiritual confidence to another so as to acquire a habitual influence over his mind can accept any gift or benefit from the person who is under the dominion of that influence, without the danger of having the gift set aside.... [This] principle prevails where there exists a relation which naturally creates influence over the mind. Therefore the doctrine extends to the relation of attorney and client, of guardian and ward, of parent and child. But there does not arise from any of these relations an influence so strong as that of a minister of religion over a person under his direct spiritual charge.

*Nottidge v. Prince*, 2 Giff. 246, 269–70, 66 Eng.Rep. 103, 113 (V.C.1860); *see also Whitmire, supra*, 42 F.2d at 701–02.

■■■■■ Not every relationship between a clergyman and a parishioner, however, is necessarily a confidential one. *Else v. Fremont Methodist Church*, 247 Iowa 127, 139, 73 N.W.2d 50, 56 (1955). "[M]embership with and devotion to a given church, accompanied by no more than the usual social intercourse between the pastor and its members, [does not] *ipso facto* [create] such a relationship." *First Christian Church, supra*, 194 Or. at 83, 241 P.2d at 142; *see also In re The Bible Speaks, supra*, 869 F.2d at 641–42; *New Eng. Merchants Nat'l Bank v. Mahoney*, 356 Mass. 654, 658, 255 N.E.2d 592, 595 (1970). Where a priest, minister, or rabbi urges the members of the congregation to make donations to a fund for the homeless or for famine relief in Somalia, contributions by parishioners cannot rationally be viewed as suspect or presumptively revocable. If the only connection between donor and donee is that the former sits in a church pew, listens to the latter's sermon, and conscientiously makes a contribution, the occasion for special scrutiny does not arise.

■■■■ Where the donee has pursued or created a condition of psychological dependency on the part of the donor, on the other hand, the inference that a relationship of trust and confidence exists is stronger, and the need for judicial vigilance against abuse of such a relationship is correspondingly greater. In *Molko v. Holy Spirit Ass'n for the Unification of World Christianity*, 46 Cal.3d 1092, 762 P.2d 46, 252 Cal.Rptr. 122 (1988), *cert. denied*, 490 U.S. 1084, 109 S.Ct. 2110, 104 L.Ed.2d 670 (1989), former members of the Unification Church sought restitution of money donated to the church, alleging, among other things, that representatives of the church had "brainwashed" and unduly influenced them, thereby abusing what had become a relationship of trust and confidence. In upholding the sufficiency of the plaintiffs'

allegations of undue influence, the court stated that a case for restitution is made out if " 'one party uses [its] dominant psychological position in an unfair manner to induce the subservient party to consent to an agreement [or contribution] to which he [or she] would not otherwise have consented.' " *Id.* at 1124, 762 P.2d at 64, 252 Cal.Rptr. at 140 (quoting JOHN D. CALAMARI & JOSEPH M. PERILLO, THE LAW OF CONTRACTS 274–275 (2d ed. 1977)).

The principal factor leading to a finding of a confidential relationship in many of the reported cases was the existence of continuous influential contacts, generally on a one-to-one basis, between an unscrupulous spiritual leader and a trusting or otherwise deferential parishioner. *See, e.g., The Bible Speaks, supra,* 869 F.2d at 631–41; *Guill, supra,* 191 Neb. at 808–09, 218 N.W.2d at 228; *Nelson, supra,* 68 A.2d at 53–55. To the extent that such continuous contacts have been shown, the plaintiffs may properly rely on the inferences derived from the cited authorities. Sermons by Bishop Meares to his entire flock, on the other hand, are not the stuff from which a confidential relationship is derived.

A warning of divine retribution if a parishioner fails to pledge or contribute a sufficient amount may alone be quite frightening, particularly if it comes from a bishop who repeatedly claims to be speaking as the representative of God. *See, e.g. Nelson, supra,* 68 A.2d at 54. When such remarks are directed from the pulpit to the congregation as a whole, however, any attempt to use the sermon as a basis for setting aside a gift implicates significant First Amendment concerns. See discussion in Part III D, *infra.* Accordingly, in the present case, the plaintiffs largely rely on conduct on the part of the defendants which is said to have gone well beyond exhortations addressed from the pulpit to the congregation at large.

According to the plaintiffs, the pressures upon them and on other parishioners were often directed at them as individuals under circumstances that made resistance extremely difficult. Those who had not pledged or given the amounts demanded by the bishop were singled out by name and ordered to walk through what was described as a humiliating gauntlet. The defendants' directives to sell or borrow included the condonation of deceptive practices vis-a-vis the proposed lenders. Moreover, in the case of Mr. and Mrs. Harrison, pressure to sell their home was placed on them not simply by warnings of divine retribution from the pulpit, but directly during a visit by one of the defendants to the very home which he wanted them to sell.

*(3) Solicitation of donations disproportionate to donor's means.*

In *In re The Bible Speaks, supra,* the court explained that undue influence may be established by circumstantial evidence as well as by direct proof, and that "its existence may be inferred from such factors as disproportionate gifts made under unusual circumstances, the age and health of the donor, and the existence of a confidential relationship." 869 F.2d at 642.

There is no claim that the plaintiffs were aged or physically infirm, but they did contend, with considerable justification, that the contributions extracted from them were disproportionate to their means. According to several plaintiffs' sworn submissions, parishioners with very modest incomes contributed many thousands of dollars to the Temple, although they plainly could not reasonably afford to do so. An impartial trier of fact might reasonably find it unusual for a needy mother of two children to contribute her entire paycheck, as plaintiff Mary Lou Moreno did, or for a middle class family to take out a second mortgage on their residence, as the Harrisons did, in order to build church facilities in Largo, Maryland, far from their own homes. "If the gift comprises all or nearly all of the donor's means, the inference of undue influence is more easily made, while if the gift is but a small part of the donor's total wealth, the presumption of undue influence is less likely to be drawn." *Undue Influence, supra,* 14 A.L.R.2d at 661. *See also Ostertag v. Donovan,* 65 N.M. 6, 12, 331 P.2d 355, 358–59 (1958); 25 AM.JUR.2D *Duress and Undue Influence* § 36, at 397–

98 (1966); *cf. Myers, supra,* 185 Md. at 217, 44 A.2d at 458.

### D. Free Exercise of Religion Considerations.

Looming large in the background of this case is the Free Exercise of Religion Clause of the First Amendment. The defendants have maintained from the outset that their dispute with the plaintiffs is a religious one into which the courts are constitutionally constrained from injecting themselves. They contend that most or all of the conduct with which the plaintiffs have charged them was dictated by their religious beliefs, and that they have a constitutional right to carry out their religious obligations without judicial interference or intrusion. The plaintiffs, on the other hand, claim that the defendants engaged in garden variety fraud and coercion and are seeking to disguise their wrongful acts by dressing them up in religious garb.

The Free Exercise Clause embraces two concepts—freedom to believe and freedom to act. *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940); *see also Employment Div. v. Smith,* 494 U.S. 872, 877, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876 (1990). "The first is absolute but, in the nature of things, the second cannot be." *Cantwell, supra,* 310 U.S. at 303–04, 60 S.Ct. at 903. "Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices." *Reynolds v. United States,* 98 U.S. 145, 166, 25 L.Ed. 244 (1879); *see also Smith, supra,* 494 U.S. at 877–89, 110 S.Ct. at 1599–1600.[22] To permit someone to engage in activities which would otherwise be proscribed by law, upon the ground that such conduct is required by his or her religion, would " 'make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself.' " *Smith, supra,* 494 U.S. at 879, 110 S.Ct. at 1600 (quoting *Reynolds, supra,* 98 U.S. at 167). Accordingly, the right of free exercise of religion "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Smith, supra,* 494 U.S. at 879, 110 S.Ct. at 1600 (citations and internal quotation marks omitted).

The trial judge correctly applied the foregoing principles in denying the defendants' motion for summary judgment on the claim of fraud.[23] The same analysis fairly applies to the allegations of undue influence. If, as the plaintiffs maintain, the defendants extracted contributions by overbearing the will of one or more of the plaintiffs, then their conduct is not insulated from judicial scrutiny by the defendants' status as clergymen. *Molko, supra,* 46 Cal.3d at 1124–25, 762 P.2d at 64–65, 252 Cal.Rptr. at 140–41; *see also Ambassador College v. Geotzke, supra,* 675 F.2d at 663–65. This is particularly true in light of the allegations that the defendants urged parishioners to engage in disingenuous conduct in connection with the simultaneous solicitation of multiple loans; the First Amendment does not provide a license to pressure parishioners into trying to swindle financial

---

**22.** "Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice?" *Reynolds, supra,* 98 U.S. at 166.

**23.** As the judge stated in his written order of October 5, 1988,

the defendants have carried the constitutional protections too far, however, in suggesting that they are immune from liability for fraud where in the guise of religious doctrine they

make knowingly false statements [and] . . . when in fact the money is concealed and used for their own personal aggrandizement. . . . And the fact that the money is raised by a church or a religious leader is not any grant of immunity from conduct that would otherwise be fraudulent conduct by any other citizen.

*See generally* Annotation, *Free Exercise of Religion Clause of First Amendment as Defense to Tort Liability,* 93 A.L.R. Fed. 755, 794–801 (1989) (hereinafter *Free Exercise* ).

institutions.[24]

The trial judge was sensitive to First Amendment considerations precluding him from placing the defendants' religious *beliefs* on trial. He remarked that the truth or falsity of what he characterized as "statements of faith"—*e.g.*, representations from the pulpit that it is the "Word of the Lord" that each parishioner must borrow or sell to raise $5,000—could not be proved, and that he was troubled by the question whether "I ought to be speaking about it at all in this courtroom."

The judge's concerns were well-founded. It is not "in the competence of courts under our constitutional scheme to approve, disapprove, classify, regulate, or in any manner control sermons delivered at religious meetings." *Fowler v. Rhode Island,* 345 U.S. 67, 70, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953). "To the extent the claims are based merely on threats of divine retribution ...,they cannot stand." *Molko, supra,* 46 Cal.3d at 1120, 762 P.2d at 61, 252 Cal. Rptr. at 137–38; *see also Snyder v. Evangelical Orthodox Church,* 216 Cal.App.3d 297, 305, 264 Cal.Rptr. 640, 644 (1989).[25]

■■■ But although a sound claim of undue influence could rarely, if ever,[26] be founded solely upon the generalized invocation from the pulpit of the wrath of God, without one-on-one or similar pressures focused upon the complaining party rather than on the audience as a whole, it does not follow that a clergyman's resort to threats of eternal damnation and the like is irrelevant. The question whether undue influence has been exercised to overbear a dependent party's will turns on all of the circumstances of the case. *Guill, supra,* 191 Neb. at 821, 218 N.W.2d at 234. Repeated reiteration, even from the pulpit, that God will curse or kill any parishioner who does not sell or borrow enough to meet the bishop's demands, potentially affects the listener's vulnerability to any subsequent and constitutionally unprotected importuning. Evidence of threats of divine retribution has been routinely received and relied upon, especially where not all of the representations were made exclusively in sermons to the entire congregation, and where some were also reiterated to the plaintiffs individually. *See, e.g., In re The Bible Speaks, Molko, Nelson,* and *Whitmire, supra.* We find no fault with the consideration of such evidence.

■■■ Attempts to shame delinquent parishioners into meeting their pledges by requiring them to walk through a gauntlet of deacons may not only humiliate and intimidate those who are doing the walking, but can also send a chilling message to others who are present or who hear of the event after the fact. Assuming without deciding that the practice is founded on the defendants' religious convictions, we do not believe that, under *Reynolds* and *Smith,* the existence of a religious basis for an improperly coercive practice will completely immunize contributions allegedly extracted thereby from judicial scrutiny. *Compare Bear v. Reformed Mennonite Church,* 462 Pa. 330, 341 A.2d 105 (1975), *with Paul v.*

---

**24.** Although none of the plaintiffs claims actually to have been induced to obtain simultaneous loans, we think that the defendants' alleged insistence that parishioners try to do so is relevant to the question whether their course of conduct as a whole went beyond the exercise of religion protected by the First Amendment.

**25.** Courts may not inquire into the "truth" or "falsity" of an individual's religious beliefs, but they may and do investigate the sincerity of the adherent's beliefs. *See International Soc'y for Krishna Consciousness, Inc. v. Barber,* 650 F.2d 430, 439 (2d Cir.1981); *see also State v. Motherwell,* 114 Wash.2d 353, 361, 788 P.2d 1066, 1070 (1990) (free exercise claimant must show that his religious convictions are sincerely held). In the present case, the judge found at the conclusion of the trial that there was no indication that the defendants did not sincerely believe what they professed to believe. We have no occasion to review this finding.

**26.** "[T]he future may bring scenarios which prudence counsels our not resolving anticipatorily." *Florida Star v. B.J.F.,* 491 U.S. 524, 532, 109 S.Ct. 2603, 2608, 105 L.Ed.2d 443 (1989). In light of the First Amendment, however, we think liability based on the content of sermons alone must be limited to truly extraordinary cases. The allegations of these plaintiffs, and particularly of Ms. Moreno, see Part III E(5), *infra,* are hardly routine, but not so extreme as to precipitate liability solely on account of representations made to the entire congregation rather than to the individual complainants.

*Watchtower Bible & Tract Soc'y,* 819 F.2d 875 (9th Cir.) *cert. denied,* 484 U.S. 926, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987); *see Free Exercise, supra* note 23, 93 A.L.R. FED. 737. At the very least, the court may consider such evidence as part of the totality of circumstances; we need not and do not decide whether a case of undue influence could be founded on such a practice, standing alone.

### E. The Sufficiency or Insufficiency of the Plaintiffs' Submissions.

#### (1) General considerations.

In the context of the legal principles discussed above, we now consider whether the sworn allegations of the various plaintiffs were sufficient to preclude the entry of partial summary judgment on their claim of undue influence. We do so in an unusual procedural context.

 The appellate record in this case, as submitted to us prior to argument, included the legal memoranda of the parties in support of and in opposition to the motion for partial summary judgment, but not the affidavits, answers to interrogatories, and depositions on which they relied. After argument, this court, on its own initiative, invited counsel to address this omission. We were subsequently provided with some of these materials [27] and, without objection, we accepted them for the record. Including both the original materials and the new ones, the plaintiffs' opposition now consists of

1. the verified second amended complaint, which was signed only by one plaintiff, Mrs. Roberts–Douglas;

2. an affidavit and answers to interrogatories by Mrs. Roberts–Douglas;

3. an affidavit and answers to interrogatories by a second plaintiff, Mrs. Mae Harrison;

4. an affidavit and deposition testimony by a third plaintiff, Frances G. Norris;

5. deposition testimony by a fourth plaintiff, Mary Lou Moreno; and

6. depositions of the individual defendants.

There were no sworn materials from plaintiffs Hugh Douglas, Daniel N. Harrison, Katherine Cogdell, Gloria J. Patty, or Kenneth Norris.[28] Although the verified complaint contains some information about the otherwise silent plaintiffs, it is of a hearsay character, and may not be considered as proof of the truth of its contents. *See* Super.Ct.Civ.R. 56(e) ("[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein"); *Spellman v. American Security Bank, N.A.,* 504 A.2d 1119, 1123 (D.C. 1986).

#### (2) Mae E. Harrison and Daniel N. Harrison.

 With respect to plaintiffs Mae E. Harrison and her husband, Daniel N. Harrison, we think that the materials submitted raise genuine issues of material fact precluding the entry of summary judgment against them. It appears from Mrs. Harrison's various submissions that she and her husband [29] were present at numerous sermons at which they were told to "borrow and sell and to obey God." According to Mrs. Harrison,

[y]ou heard it so much that if you did not give you felt embarrassed and humiliated.

As a deacon, Mrs. Harrison was expected to put pressure on other parishioners to pledge and contribute $5,000 per working person.

In this context, Elder Donald Meares visited the Harrisons' home and urged them

---

**27.** One of the briefs in the trial court, however, cites at least one deposition, that of plaintiff Hugh Douglas, which was not provided to us.

**28.** The experiences of Mr. Douglas, Mr. Harrison and to a lesser extent Mr. Norris were, however, described in some measure in the materials provided by their wives.

**29.** In some instances, it is not clear whether both Mr. and Mrs. Harrison were present or only Mrs. Harrison. It appears, however, that the gifts as to which restitution is sought were given jointly.

to sell it, indicating that this was God's will. The Harrisons declined to do so, but they did obtain a second mortgage, pledged $20,000 to the building fund, and contributed $7,900. Referring to the gauntlet of deacons, Mrs. Harrison related that

> I felt compelled to walk through the line even though I did not want to. The Elders praised those who had met their pledges, but those who had not given were intimidated.[30]

To be sure, Mrs. Harrison never stated in so many words, in any of the documents before us, that she and her husband made their contributions on account of the coercive conduct of which she complained. In response to the defendants' interrogatories, however, she asserted that she and her husband left the Evangel Temple because "we had begun to believe that we were exploited and abused." She related that

> we were tired of being afraid to speak what we felt and we certainly did not want to give any more money. We felt oppressed and depressed about the whole experience.

Construed in the light most favorable to the plaintiffs, this account indicates a belief on Mrs. Harrison's part that prior donations had been the result of coercion and oppression. Since Mrs. Harrison felt "compelled" to run through the gauntlet and make her very substantial pledge, and since she "felt oppressed" about the "whole experience," obviously including the donation of large sums of money, we are not prepared to hold, on summary judgment, that there is no genuine issue of material fact as to whether the contributions resulted from the alleged "oppression."

Concededly, the Harrisons' evidence, as contained in the materials submitted in opposition to the motion, was less than overwhelming. The pressures on this couple, however, were not limited to appeals from the pulpit. The money was contributed in the context of, and implicitly in response to, the defendants' unrelenting demands. The amounts were large, and the Harrisons had to take out a second mortgage on their home. Although the issue is a close one, we hold that the Harrisons have alleged enough to avoid summary judgment.

### (3) Shirley Roberts–Douglas and Hugh Douglas.

 In the verified complaint, and in her answers to interrogatories and affidavit, Mrs. Roberts–Douglas catalogued most of the alleged coercive practices which are discussed in this opinion. Of all of the plaintiffs, she and her husband and children allegedly pledged and contributed the largest amounts. Although she was not required to walk the gauntlet, Mrs. Roberts–Douglas was aware of it, and an impartial trier of fact might reasonably conclude that the gauntlet procedure was intended not only to expose currently delinquent parishioners but also to inhibit or frighten others into avoiding delinquency in the future. In the verified complaint, Mrs. Roberts–Douglas alleged that many other persons sold or mortgaged their homes and went into heavy debt as a result of the defendants' allegedly coercive tactics.

The picture painted by Mrs. Roberts–Douglas in her pleadings is a poignant one, but her submissions are devoid of any allegation that she and her husband gave to the building fund as a result of the alleged intimidation, or that they would not have contributed in the absence of threats of God's wrath. Moreover, her submissions contain nothing suggesting any one-on-one or similar pressures directed at her or her husband to induce contributions.[31] We conclude that, affecting as these plaintiffs' case may be, they have presented no genuine issue of material fact, and the defen-

---

**30.** It is not clear from Mrs. Harrison's affidavit whether she contributed any money after being subjected to the gauntlet.

**31.** Mrs. Roberts–Douglas has described in detail intimidating tactics allegedly used by the defendants subsequent to her request for an accounting of funds. These events, however, plainly occurred after the contributions were made, and immediately before these plaintiffs' expulsion from the Evangel Temple. They could not have retroactively induced the Douglases to contribute.

dants are entitled to judgment against them as a matter of law.

### (4) Frances G. Norris and Kenneth E. Norris.

Mrs. Norris, a secretary, testified at her deposition that the deacons initially told her and her husband that each family should pay $5,000 towards the new building, that they were given half an hour to consider what "the Lord wanted us to do," and that her husband felt that God wanted them to make the contribution. When the deacons returned, however, Mrs. Norris was advised that the instructions had been changed, and that she and her husband should each contribute $5,000; the total contribution demanded, not including tithes and other gifts, was about 22% of the couple's annual income. Mr. and Mrs. Norris borrowed the money, contributed it, and went into substantial debt.

Asked whether she and her husband contributed willingly, she stated that

> we did because we felt this was from the Lord. And then we did because I felt that we were brainwashed Sunday after Sunday after Sunday.

Nowhere did Mrs. Norris allege, however, that any pressure was placed upon her except at the first meeting with deacons and in sermons from the pulpit. In light of the authorities cited, the submission of Mr. and Mrs. Norris is insufficient to avoid summary judgment.

### (5) Mary Lou Moreno.

Ms. Moreno, a divorced mother of two teenaged daughters, is the sister of Mrs. Norris. At the time of her deposition, her annual income was less than $10,000. She testified in pertinent part as follows:

> The only thing I can say to that is [that] after the retreat we had and the money that they were asking us to pledge of $5,000, and then coming back to the services on Sundays, and every Sunday they would always preach mon-

ey, money, money, and that was a pressure that I couldn't take any more of, money, money, money, preached every Sunday that I know of. Then, when Pastor Meares stated that if we didn't give the $5,000 that God would put a curse on us, or he would turn his back on us, that is what made me very uncomfortable, and being forced to do something that I knew I couldn't do, and that I had to do it so that God wouldn't put a curse on me.

> The reason that I am here now is if I couldn't give them the $5,000 that they wanted and only gave what I could and God would put a curse on me, I would rather take my money back and let God do whatever.

Ms. Moreno attempted to obtain loans from three banks, but did not qualify. Having pledged $5,000, and having found herself unable to raise that amount, she contributed an entire paycheck.

It was Ms. Moreno's testimony at the trial that especially affected the judge's heart. See note 2, *supra*. Nevertheless, like her sister, any coercion she has alleged came from the pulpit to the congregation at large. On the record before him,[32] the judge properly entered partial summary judgment against her.

### (6) Other plaintiffs.

Although the contributions and experiences of other plaintiffs were described in the verified complaint, there is no non-hearsay evidence of the amounts they pledged, of any coercion which they encountered, or of their reasons for contributing. One of them, Ms. Patty, allegedly contributed a child support check because she had nothing else to give, but these plaintiffs have presented no genuine issue of material fact which could defeat the defendants' motion for partial summary judgment.

---

**32.** We emphasize that Ms. Moreno and the other plaintiffs provided no materials at the summary judgment stage which indicated that the threats from the pulpit were followed up by similar warnings, on a one-on-one or other individual-ized basis, from elders or deacons seeking to induce payment. If such evidence existed, it was not presented in opposition to the motions, nor is it a part of the summary judgment record.

## V

## CONCLUSION

The judgment for the defendants on the plaintiffs' claim of intentional infliction of emotional distress is affirmed. The judgment for the defendants on the claim of fraud is vacated, solely on the ground that the plaintiffs' discovery was improperly restricted. The order granting the defendants summary judgment on the undue influence claim is reversed as to plaintiffs Daniel N. Harrison and Mae E. Harrison, and affirmed as to all other plaintiffs. The order denying the defendants' request for sanctions in the trial court is affirmed. All requests by both parties for sanctions pursuant to D.C.App.R. 38 are denied. The case is remanded to the trial court for further proceedings consistent with this opinion.

*So ordered.*

WAGNER, Associate Judge, concurring in part and dissenting in part:

I join the decision of the court except for disposition of the discovery issue and reversal of judgment for appellees on the fraud count. In my opinion, the trial court did not abuse its broad discretion in denying, in part, appellant's motion to compel discovery. Moreover, the discovery order was not a substantial reason for appellants' inability to proceed with their claims. *See White v. Washington Metropolitan Area Transit Authority,* 432 A.2d 726, 729 (D.C. 1981) (improper discovery ruling reversible error where it is a substantial reason for a party's inability to proceed); *see also Bell v. Swift & Co.,* 283 F.2d 407, 409 (5th Cir.1960) (showing of substantial prejudice required to reverse for improper discovery ruling). Appellees argue, persuasively in my view, that it was appellants' failure to avail themselves of the discovery allowed which precluded them from determining whether appellees obtained church mem-

bers' contributions by fraud and used them for purposes other than those intended.

The trial court has " 'broad discretion' in its handling of discovery, and its decision to allow or deny discovery is reviewable only for an abuse of discretion." *Brune v. I.R.S.,* 274 U.S.App.D.C. 89, 93, 861 F.2d 1284, 1288 (1988); *White, supra,* 432 A.2d at 729. Unquestionably, in making its ruling, the trial court must operate under the principles that the scope of discovery under Super.Ct.Civ.R. 26(b)(1) is broad and that interpretation of the rule is accorded liberal treatment. *Dunn v. Evening Star Newspaper Co.,* 232 A.2d 293, 295 (D.C.1967). However, the bounds of discovery are not without limits. *Hickman v. Taylor,* 329 U.S. 495, 507–08, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947); 4 MOORE'S FEDERAL PRACTICE § 26.56[1], at 26–96 (2d ed. 1991). The information sought under Rule 26(b)(1) is limited to matters which are relevant to the *subject matter* of the suit. *See Hickman, supra,* 329 U.S. at 508, 67 S.Ct. at 392. This has been interpreted to mean that discovery requests must have some bearing on the real or "core" issues in the case. *Clyburn v. News World Communications, Inc.,* 117 F.R.D. 1, 2 (D.D.C.1987); *Sharon v. Time, Inc.,* 103 F.R.D. 86, 95 (S.D.N.Y. 1984).[1] The boundaries of relevance depend upon the contours of the particular action. 4 MOORE'S FEDERAL PRACTICE § 26.-56[1], at 26–97. The trial court's ruling on any individual discovery request must also be viewed in the context of the objections raised and other discovery granted. Viewed in that context, in my opinion, the trial did not abuse its discretion in entering an order compelling only some of the requested discovery prior to the filing of the second amended complaint.

A review of appellants' second amended complaint, appellees' answer, and the elements required to establish fraud reveals the core issues in this case.[2] Appellants,

---

**1.** In interpreting local rules which are identical to the federal rules, we may look to the decisions of federal courts interpreting the rule as " 'persuasive authority'." *Cohen v. Owens & Co., Inc.,* 464 A.2d 904, 906 n. 3 (D.C.1983) (quoting

*Vale Properties, Ltd. v. Canterbury Tales, Inc.,* 431 A.2d 11, 13 n. 3 (D.C.1981)).

**2.** The trial court entered its order compelling discovery on November 2, 1987. On November 25, 1987, the trial court ordered all plaintiffs to file a second amended complaint "pleading all

former members of appellees' church, alleged that appellees, through fraud and misrepresentation, induced them to pledge large sums of money for the construction of church facilities, for other charitable purposes, "and for the personal benefit of [appellees]" by engaging in fraudulent and coercive fund-raising methods. Specifically, appellants alleged that appellees fraudulently misrepresented: (1) the financial circumstances of the Temple and the earnings of its officials; (2) the extent of Bishop Meares' contributions (for which he was reimbursed from church funds); (3) the real purpose of the proposed new church facility in Prince George's County; (4) that contributions were for the Temple, although the property is owned and controlled by Bishop Meares and his family; and (5) that contributions were used for the poor and underprivileged or would be used for church buildings and to purchase a parking lot adjoining the Temple.[3] Appellants sought return of their contributions with interest and punitive damages. Appellees answered that appellants contributed voluntarily and that their fund-raising activities are protected by the First Amendment.

To establish a claim of fraud, appellants had to allege and prove that appellees made: "(1) a false representation, (2) concerning a material fact, (3) . . . with knowledge of its falsity, (4) with the intent to deceive, and (5) upon which [appellants relied]." *Higgs v. Higgs,* 472 A.2d 875, 876 (D.C.1984). The real issues involved in the fraud count involve these elements and the allegations relied upon by appellants to support them. Considering the issues, the proof must focus upon whether the money was obtained by false representations of material fact, including whether funds

were used for a purpose other than promised or intended. Information pertaining to the church's receipt and disposition of the contributions is clearly relevant to these issues, and the trial court ordered all such information and more to be produced as requested by appellants.

The trial court ordered responses to questions requiring appellees to disclose the number of members of the Temple; the number who had made pledges to the building fund and related facilities; and the total amount of money pledged and the amount collected. The court also ordered appellees to identify and disclose financial records reflecting the receipt and expenditure of church funds; the bank or banks and other financial institutions used as a depository for the funds; the amount remaining on deposit and the location of banks in which funds are deposited; the amount of each expenditure from the fund and the purpose for the expenditure; the financial records reflecting the receipt and expenditure of church funds; all financial statements of the Temple for the years 1970 to present; and all documents to or from contributors requesting return of any part of their contributions. This broad discovery covered all financial information related to the fraud claim in my opinion.

Appellants point out that the relevancy of the financial records is demonstrated by the statement made by the trial court in dismissing the fraud claim. What the trial judge observed was:

> there is no evidence before me of any kind that one penny of the money that was solicited for this project or indeed for the earlier projects about which the plaintiff's [sic] complained went for purposes other than those which they were

allegations [of fraud] with specificity as required by Civil Rule 9(b) of [the Superior Court]." Some of the same allegations are set forth in both complaints. Considering the trial court's ruling in light of either complaint, I find no abuse of discretion.

**3.** There are other allegations of fraudulent and false representations which do not relate to the financial disclosure issue before the court (*e.g.* representations that members would be rewarded for contributions or cursed by God if they

failed to honor their pledges). Appellants also alleged that appellees urged the contributors to reject the "Spirit of Mammon, meaning false God of riches and avarice," and appellants also asserted that "[a]t the same time defendants themselves are living in fine homes, fully furnished." However, in my opinion, this allegation that appellees did not practice what they preached is not a core issue to the fraud count which entitles appellants to disclosure of all personal financial information of appellees.

solicited. It's possible that it did not but plaintiff's [sic] bear the burden of proving that claim by clear and convincing evidence.... [T]here is not any evidence at all of any kind before me that this money has been misspent or misappropriated by any of the defendant's [sic] in this action.

Since appellees were ordered to respond to questions and to produce books and records reflecting every receipt and expenditure of all church funds and all information about its assets for many years, appellants' inability to show that their contributions were spent for purposes other than those intended cannot be reasonably attributable to the denial of the motion to compel with respect to other information sought. Appellants' failure to avail themselves of the broad discovery granted, while not a consideration in the court's discovery order, is a significant factor in determining whether the trial court's order was a *substantial* reason for appellants' inability to prove their fraud claim, *see White, supra,* 432 A.2d at 729, and resulted in *substantial* prejudice requiring reversal. *See Bell, supra,* 283 F.2d at 409. In my view, the court's discovery order was not a substantial reason for appellants' inability to proceed, and reversal is not warranted on that ground.

An examination of the information which appellants contend was withheld improperly confirms this conclusion. Appellants' claim of error is limited to the trial court's denial of their requests for: (a) information concerning appellees' business interest; (b) whether money raised for the building fund or the Temple was sent outside of the District of Columbia, United States and Prince George's County; (c) salaries and fringe benefits provided to the church leadership since 1975; and (d) the individual net worth of each defendant since 1975. The items in categories (b) and (c) overlap or are covered by the material which the court ordered to be disclosed. The disclosure of the books and records reflecting every receipt and expenditure of the church would show necessarily the disposition of the building fund and the salaries and benefits of church leaders. Accordingly, I discern no abuse of discretion in the trial court's denial of the additional requests nor prejudice to appellants' claim by reason of the ruling. In my view, the material in categories (a) and (d), at least prior to the establishment of liability, is not reasonably relevant to the core issues of the claimed fraud or to a sensible investigation of those issues through discovery.[4] The gravamen of appellants' fraud claim was essentially as the trial court described it, related to appellees' alleged misrepresentation of the purpose for the contributions and diversion of the funds collected. I do not understand appellants to disagree with this characterization of the issues. In my view, neither appellees' personal business interest nor their personal net worth since 1975 was necessary to develop these core issues as disclosed by the record when the court ruled on the motion to compel.[5] For the foregoing reasons, I perceive no abuse of discretion in the court's ruling on the motion and no substantial prejudice to appellants' development of the fraud count by reason of the trial court's order which requires reversal of the judgment on that count. Accordingly, I respectfully dissent from that aspect of the court's decision.

4. There is no dispute that the financial status of the defendants is relevant to the claim of punitive damages. *See Robinson v. Sarisky,* 535 A.2d 901, 907 (D.C.1988) (relative worth of a defendant relevant to the amount of punitive damages). However, the trial court can properly order that disclosure be deferred until after *prima facie* proof of liability for such damages has been established. *Hudak v. Fox,* 215 N.J.Super. 233, 521 A.2d 889, 890 (A.D.1987); *Belinski v. Goodman,* 139 N.J.Super. 351, 354 A.2d 92, 95 (A.D.1976); *see also Hecht v. Pro–Football, Inc.,* 46 F.R.D. 605, 607 (D.D.C.1969).

5. Apparently, appellees did not renew their requests to compel discovery.